**Efrain MALDONADO, Jesus Colon, Rene Torres, Nelson Garcia, Hector Colon, Reinaldo Clarin, Angel Caraballo, Daniel Caraballo, Hernan Cortes, Luis Acevedo, Benjamin Pabon, Roberto Claudio, Pablo Sanchez, Alfredo Muniz, Felipe Melendez, and Ketsy Alicea (Merced), Plaintiffs,**

v.

**Rusty LUCCA, Lawrence Errera, d/b/a Bar O Farms, and Pedro Bermudez, Defendants.**

Civ. A. No. 85–1471.

United States District Court, D. New Jersey.

Feb. 24, 1986.

Laurence E. Norton, II, Vineland, N.J., for plaintiffs.

William S. Cappuccio, Hammonton, N.J., for defendants Rusty Lucca and Lawrence Errera, d/b/a Bar O Farms.

---

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

BROTMAN, District Judge.

This case arises under the Fair Labor Standards Act, 29 U.S.C. § 201 *et seq.* ("FLSA"), the Migrant and Seasonal Agricultural Worker Protection Act, 29 U.S.C. § 1801 *et seq.* ("MSPA"), and the New Jersey Wage and Hour Law, N.J.S.A. 34:11–1 *et seq.* ("New Jersey Act"). Plaintiffs are migrant and seasonal agricultural workers who were recruited in 1984 by defendant Pedro Bermudez, a state- and federally-registered crew leader, to pick blueberries on farmland operated by defendants Rusty Lucca and Lawrence Errera, doing business as Bar O Farms. Plaintiffs contend that defendants Lucca and Errera violated FLSA, MSPA and the New Jersey Act by, *inter alia,* failing to pay them the minimum hourly wage for all hours worked. Jurisdiction is based on 28 U.S.C. § 1331 and the doctrine of pendent jurisdiction.

Pursuant to its discretion under Fed.R. Civ.P. 42(b), the court bifurcated the action and commenced a non-jury trial on January 6, 1986 on the sole issue of whether defendants Lucca and Errera were plaintiffs' "employers" within the meaning of the FLSA, the MSPA and the New Jersey Act. The court now makes the following findings of fact and conclusions of law, as required by Fed.R.Civ.P. 52(a)

## FINDINGS OF FACT

1. Plaintiffs are migrant and seasonal farmworkers who were recruited and hired by defendant Pedro Bermudez in June 1984 to pick blueberries in southern New Jersey. Fifteen of the plaintiffs are from Puerto Rico; one, Ketsy Merced (a/k/a Ketsy Alicea) is a resident of New Jersey. She is the only seasonal farmworker among the plaintiffs, since by definition, seasonal workers work close enough to their homes to spend the night there, while migrant workers are too far from home to return there daily.

2. Defendants Rusty Lucca and Lawrence Errera are farmers and partners in Bar O Farms, a partnership whose main office is in Hammonton, New Jersey. They grow blueberries and peaches on leased land in Belleplain, New Jersey and in the Hammonton vicinity.

3. In June 1984, Lucca and Errera hired Bermudez on the understanding that he would furnish them with labor to harvest their blueberry crop for the entire growing season. Lucca and Errera advanced Bermudez $3,500.00 for labor costs before the picking season began.

4. In 1984, Bermudez was certified as a "crew leader" by the state of New Jersey, N.J.S.A. 34:8A–7 *et seq.*, and as a "farm labor contractor" by the United States Department of Labor, 29 U.S.C. § 1801 *et seq.;* 29 C.F.R. Part 500, Subpart B.

5. Acting independently, Bermudez recruited several dozen migrant and seasonal workers, including plaintiffs, as members of his picking crew. Bermudez provided food and housing for the migrant workers in his crew and transportation to and from the fields for both migrant and seasonal workers.

6. Bermudez and his crew picked blueberries in Bar O Farms' fields every day, weather permitting, from June 29 to July 5, 1984. Most pickers worked from about 7:00 a.m. to 3:00 or 4:00 p.m.

7. Picking blueberries is not a skilled task. Workers picked the berries from the bush and dropped them into a large coffee

can or other container. When that container was full, they transferred the blueberries into pint cartons and placed the cartons into 12-pint carriers. Bermudez supplied the picking containers; defendants Lucca and Errera supplied the carriers and pint cartons, in which the blueberries eventually reached consumers.

8. Workers were paid on a piece rate, $2.30 per 12-pint carrier ("crate"). Defendants Lucca and Errera paid Bermudez $2.65 per crate.

9. An average picker can pick one crate per hour. A fast picker can pick two crates.

10. Defendants Lucca and Errera established the system for compensating workers who picked blueberries on their land. When a worker filled a 12-pint carrier, he or she would turn it into a truck where Lucca or one of his agents checked the berries and issued a receipt marked "Bar O Farms. 12 pints." Every Friday, members of Bermudez' crew turned in their week's accumulation of receipts to Bermudez, who paid them in cash for each receipt. Defendants reimbursed Bermudez when he turned over the receipts to them.

11. Plaintiffs were never paid for their final week of work.

12. Plaintiffs never received a written explanation of the terms of their employment, nor any record of the hours they worked or the amount of money they received.

13. No deductions were made from plaintiffs' pay for Social Security or unemployment contributions.

14. Lucca supervised the day-to-day operation of Bar O's blueberry business. He assigned picking crews to particular fields, frequently walked through the fields monitoring pickers' performance, and sometimes inspected crates of berries before pickers received receipts. On at least two occasions, Lucca directed a crew leader to fire a delinquent picker.

15. Lucca speaks no Spanish. Most of the pickers, including most of the plaintiffs, are native Spanish-speakers and speak little, if any, English. Lucca communicated with pickers through Bermudez and other crew leaders, who were bilingual.

16. After an angry confrontation about which fields Bermudez' crew should work in, Lucca fired Bermudez on July 5, 1984. Through an interpreter, Lucca told members of Bermudez' crew that they were welcome to stay on and continue picking blueberries for Bar O Farms under another crew leader's supervision. No one elected to stay, and Bermudez' bus left immediately. One member of Bermudez' crew did return the following day and was assigned to another crew leader.

17. Defendants knew that state law required crew leaders to furnish them with payroll records, and they required the crew leaders to submit those records to them on a daily basis. Bermudez was lax about this obligation, filing no records at all for the first week, then filing a few days' worth every several days.

18. Lucca scanned payroll records when they were submitted to satisfy himself that blueberry pickers were making the minimum wage.

19. The $3,500.00 "advance" which Lucca and Errera paid Bermudez at the beginning of the season was never balanced by subsequent deductions. In other words, Bermudez received that advance as well as the full amount for which his payroll indicated he was entitled in order to pay his crew.

20. In July 1984, plaintiffs and other members of Bermudez' crew filed claims for unpaid wages with the state Department of Labor and Industry. State officials investigated the claims and inspected Bar O Farms' payroll records before asking defendants Lucca and Errera to write checks to the claimants to compensate them for unpaid minimum wages. These checks were delivered to these officials for distribution.

21. Some workers claimed their checks. Others, including plaintiffs, did not because defendants made payment conditional on waiver of other claims.

22. It is the custom and practice in the New Jersey blueberry industry to employ migrant and seasonal blueberry pickers through crew leaders.

23. State and federal officials hold annual informational meetings for crew leaders and farmers in New Jersey to explain their duties and obligations under the laws. Defendant Errera attended such a meeting in 1984, where the particular focus was on the crew leader's legal obligations.

## CONCLUSIONS OF LAW

■ The FLSA defines "employer" as "any person acting directly or indirectly in the interest of an employer in relation to an employee...." 29 U.S.C. § 203(d). Courts have interpreted this statutory definition broadly in order to effectuate the FLSA's liberal, remedial purposes. *Bonnette v. California Health and Welfare Agency,* 704 F.2d 1465, 1469 (9th Cir.1983); *Real v. Driscoll Strawberry Assoc.,* 603 F.2d 748, 754 (9th Cir.1979). The common law's conception of the employer-employee relationship is not determinative. *Usery v. Pilgrim Equipment Co.,* 527 F.2d 1308, 1311 n. 6 (5th Cir.), *cert. denied,* 429 U.S. 826, 97 S.Ct. 82, 50 L.Ed.2d 89 (1976).

■ To determine whether an employment relationship exists for purposes of the. FLSA, the court must consider the underlying "economic reality." *Goldberg v. Whitaker House Cooperative, Inc.,* 366 U.S. 28, 33, 81 S.Ct. 933, 936, 6 L.Ed.2d 100 (1961). While courts have identified several relevant factors, the final determination depends not on "isolated factors but rather upon the circumstances of the whole activity." *Rutherford Food Corp. v. McComb,* 331 U.S. 722, 730, 67 S.Ct. 1473, 1477, 91 L.Ed. 1772 (1947).

■ The statutory definition of "employer" can encompass two or more individuals with respect to the same employee. *Hodgson v. Griffin and Brand of McAllen, Inc.,* 471 F.2d 235 (5th Cir.), *reh'g denied,* 472 F.2d 1405, *cert. denied,* 414 U.S. 819, 94 S.Ct. 43, 38 L.Ed.2d 51 (1973). In regulations enacted to implement the FLSA, the Department of Labor specifically endorses this doctrine of joint employment. Under 29 C.F.R. § 791.2, a determination of joint employment "depends upon all the facts in the particular case" and the rule of thumb is whether an employee's work for one employer is "completely disassociated from his or her work for another." 29 C.F.R. § 791.2(b). A joint employment relationship is generally deemed to exist (1) where one employer is acting directly or indirectly in the other's interest in relation to the employee and (2) where the employers are "not completely disassociated with respect to the employment of a particular employee and may be deemed to share control of the employee, directly or indirectly, by reason of the fact that one employer controls, is controlled by, or is under common control with the other employer." 29 C.F.R. § 791.2(b)(2), (3).

■ Regulations enacted under and interpretive rulings relating to the FLSA are not binding on the court but are entitled to great weight. *See Donovan v. I-20 Motels, Inc.,* 664 F.2d 957 (5th Cir.1981); *Atkins v. General Motors Corp.,* 701 F.2d 1124 (5th Cir.1983).

In the agricultural context, farm owners and crew leaders have been held to be joint employers of migrant workers within the meaning of the FLSA. *Griffin and Brand, supra.* In *Griffin and Brand,* the Court of Appeals for the Fifth Circuit identified several factors which the court can consider in looking at the "economic reality" of a particular employment arrangement. Those factors have been specifically endorsed by Congress in determining joint employment of farmworkers for FLSA and MSPA purposes. *See* H.R.Rep. No. 97-885, 97th Cong., 2d Sess., page 7 (1982) reprinted in 1982 U.S.Code Cong. & Ad. News 4547, 4553 ("House Report").

■ The *Griffin and Brand* factors include: (1) whether the employment took place on the alleged employer's premises; (2) how much control the alleged employer exerted over the workers; (3) whether the alleged employer had the power to hire and fire workers or to modify their employment

conditions; (4) whether the workers performed a "specialty job" within the line of production; and (5) whether the worker could refuse to work for the alleged employer or choose to work for others. 471 F.2d at 237–38. The fifth factor has never been applied in the agricultural context; but considering the other factors in conjunction with the federal regulations and in light of the facts of the instant case leads to a single, inescapable conclusion: defendants Lucca and Errera were, with Pedro Bermudez, plaintiff's "joint employers."

■ Plaintiffs picked blueberries on land which Bar O Farms leased and operated. Lucca and Errera designed, implemented and ultimately controlled the picking process and the payment system. Lucca spent considerable time in the fields monitoring workers and crew leaders and at least twice instructed a crew leader to dismiss a worker immediately because Lucca was displeased with the worker's performance. Lucca selected the area of the fields where each crew worked on any given day and had the sole authority to transfer a crew to a new field. When Lucca fired Bermudez, he informed members of Bermudez' crew that they could continue to pick blueberries from Bar O Farms if they switched to another crew leader's supervision. These facts indicate that despite the presence of crew leaders who acted as intermediaries between the farmers and the workers for purposes of recruitment, translation, and day-to-day supervision, the blueberry pickers were also employed by Lucca and Errera. In addition, picking blueberries qualifies as a "specialty job" within the process of taking berries from field to market because it is an annual, integral element of agricultural production. The "economic reality" is unmistakable: plaintiffs were employees and defendants were their employers.

Both the federal government and the state of New Jersey have enacted comprehensive statutory schemes to regulate the use of migrant and seasonal workers in the agricultural industry, largely to protect such workers from exploitation. The federal Migrant and Seasonal Agricultural Worker Protection Act ("MSPA"), 29 U.S.C. § 1801 *et seq.*, enacted in 1983, repealed and replaced the Farm Labor Contractor Registration Act of 1963 ("FLCRA").

Congress enacted the FLCRA in 1963 "to protect agricultural workers whose employment had been historically characterized by low wages, long hours and poor working conditions." House Report at 4547. Under the FLCRA's scheme, "virtually all duties, responsibilities and protections" ran through the "farm labor contractor," an intermediary hired by farm operators to recruit and supply migrant and seasonal workers. *Id.* at 4548. The FLCRA, however, failed to eliminate the targeted abuses and Congress decided to replace it with the MSPA, "a completely new approach." *Id.* at 4549.

The MSPA uses the term "employ" in the identical sense as does the Fair Labor Standards Act, 29 U.S.C. § 203(g). In commenting on this definitional choice, the Education and Labor Committee said:

The Committee's use of this term was deliberate and done with the clear intent of adopting the "joint employer" doctrine as a central foundation of this new statute; it is the indivisible hinge between certain important duties imposed for the protection of migrant and seasonal workers and those liable for any breach of those duties. The determination of whether a farm labor contractor, agricultural employer or agricultural association has certain duties under this Act will turn on whether such person is an employer of migrant or seasonal agricultural workers.

*Id.* at 4552. The Committee then explained the joint employer doctrine and made explicit reference to the *Griffin and Brand* factors discussed *supra.* The report continued:

The Committee in recognizing that the agricultural economy contains many and varied employment relationships involving a mixture of employers, contractors and employees, wishes to make clear that

under the construction of the joint employer concept as set forth in the foregoing, it envisions situations where *a single employee may have the necessary employment relationship with not only one employer but simultaneously such a relationship with an employer and an independent contractor* or with several employers with or without the inclusion of an independent contractor. The focus of each inquiry, therefore, must be on each employment relationship as it exists between the worker and the party asserted to be a joint employer. In the tests and criteria as set forth in this section it is expected that the special aspects of agricultural employment be kept in mind.

*Id.* at 4553–54 (emphasis added).

■ While the MSPA does apportion certain responsibilities to a "farm labor contractor" and others to an "agricultural employer," Congress' plain intent was to protect migrant and seasonal workers from abuse and exploitation, and to hold "agricultural employers" fully accountable as joint employers whenever the facts suggest that liability is fairly imposed.

■ The New Jersey statute does place responsibility for record keeping on the crew leader, as defined in N.J.S.A. 34:8A–7. The court believes that defendants Lucca and Errera did act responsibly in requiring their crew leaders to submit payroll records and to provide proof of their state and federal certification. They complied with the state's investigation of Bermudez' crew members' claims for unpaid wages and willingly wrote checks to satisfy the amounts the state decided were due. However, the court is obliged to find that defendants Lucca and Errera were plaintiffs' employers within the meaning of the federal scheme. Defendants' prior conduct and compliance may well mitigate the amount of damages assessed against them, but the issue of damages is not before the court at this time.

Migrant and seasonal workers are an important component of the agricultural labor force in New Jersey. Just like any other workers, they are entitled to receive at least the minimum wage for the hours they work and to be treated fairly and humanely by the businesses which profit from their physical efforts. The federal statutory scheme, constructed with the rights of these workers in mind, dictates that any farmer who employs migrant or seasonal workers through a crew leader be held jointly liable for any noncompliance with wage and hour laws. The court is aware that defendants Lucca and Errera and their counterparts will have to change aspects of the way they run their businesses as a result of the court's decision. However, this added administrative burden pales in comparison to the injustice suffered by migrant and seasonal workers who are underpaid in the first instance and who cannot realistically recover unpaid wages from a crew leader who is undercapitalized and nowhere to be found.

Accordingly, the court finds in favor of plaintiffs on the issue of liability and will enter an order directing that judgment be entered for plaintiffs.