James E. LEACH, Jr., John Barber, Jr., Charles Hill, Jr., James Lemons, and Jose Mateo–Diego, Plaintiffs,

v.

Albert B. JOHNSTON, Thomas Alexander, Sr., Defendants.

No. 90–1138–Civ–J–16.

United States District Court, M.D. Florida, Jacksonville Division.

Oct. 7, 1992.

Gregory S. Schell, Florida Rural Legal Services, Inc., Belle Glade, FL, for plaintiffs.

Ronald E. Clark, Palatka, FL, for defendant Johnston.

Alan Boyd Fields, Jr., Dowda & Fields, Chartered, Palatka, FL, for defendant Alexander.

## OPINION

JOHN H. MOORE, II, Chief Judge.

Plaintiff James E. Leach, Jr. ("Leach") commenced this action against Defendants Albert B. Johnston ("Johnston") and Thomas Alexander, Sr. ("Alexander") on December 21, 1990. The Complaint sought monetary damages, declaratory relief, injunctive

relief and the recovery of costs and attorney's fees as a result of the Defendants' alleged violations of sections of the Migrant and Seasonal Agricultural Worker Protection Act ("MSAWPA"), 29 U.S.C. § 1801, *et seq.*, and the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201, *et seq.*

On April 2, 1991, the Court held a Preliminary Pretrial Conference and set the case on track. Contemporaneously, the Court allowed the filing of an Amended Complaint (Doc. # 13) joining Plaintiffs John Barber, Jr. ("Barber"), Charles Hill, Jr. ("Hill"), James Lemons ("Lemons") and Jose Mateo–Diego[1]. The Court held a nonjury trial on December 9 and 10, 1991. After due consideration of the evidence adduced at trial, the record in its entirety and the proposed findings of fact and conclusions of law submitted by counsel, the Court makes the following Findings of Fact and Conclusions of Law in compliance with Rule 52(a), Fed.R.Civ.P.

*Findings of Fact*

1. Defendant Johnston, along with his brother, operated a farm west of Bunnell in Flagler County, Florida on which cabbage, cucumbers, squash, peppers and potatoes were produced for sale in interstate commerce at all times pertinent to this litigation. Johnston is a resident of Bunnell, Florida.

2. Defendant Alexander is a resident of Palm Coast, Florida who has worked as a farm labor contractor for at least the past twenty years. In that time, he has furnished agricultural labor to farms in Florida and other states. Specifically, Alexander furnished agricultural workers to Johnston for work on Johnston's vegetable crops for the seasons of 1987–88, 1988–89 and 1989–90.

3. Plaintiffs were agricultural workers in Alexander's crew that worked on Johnston's farm at the respective times specified below.

4. Plaintiff Leach worked on Johnston's farm during the 1988–89 vegetable season.

Although Leach's home was in Wendell, North Carolina (Doc. # 39 at p. 4), he was living in Apex, North Carolina at the time of his recruitment to Johnston's farm (*Id.* at p. 7).

5. Plaintiff Barber worked on Johnston's farm during the vegetable seasons of 1987–88, 1988–89 and 1989–90. Barber's residence was not established at trial.

6. Plaintiff Hill worked on Johnston's farm during the vegetable seasons of 1987–88, 1988–89 and 1989–90. Like Barber, Hill's residence was not established.

7. Plaintiff Lemons worked on Johnston's farm during the vegetable seasons of 1988–89 and 1989–90. Lemons' home was in Smithfield, North Carolina (Doc. # 36 at p. 6).

8. Alexander transported his crew to several farms in different states throughout the year. He described his "sequence" as follows: (1) his crew usually arrived at Johnston's farm in late November and labored for six months, finishing in late May or early June; (2) the crew departed Johnston's and traveled to North Carolina to work on farms located near Elizabeth City; (3) around July, the crew journeyed to Delaware for a couple of months; (4) in September, the crew returned to North Carolina, this time near Smithfield, to work until November; (5) in November, the routine began again at Johnston's (Doc. # 37 at pp. 63–65).

9. Alexander paid his crew on an hourly basis for their work on Johnston's farm. The wage rate was normally the federal minimum wage: $3.35 per hour prior to April 1, 1990; $3.80 per hour from April 1, 1990 to March 31, 1991.

10. The tasks performed by Alexander's crew on Johnston's farm were unskilled and required little direct supervision. The crew harvested cabbage, peppers and cucumbers. They graded and packed cucumbers and potatoes as well. Additionally, they assisted in the planting of Johnston's cabbage crop. The crew's daily routine,

---

1. Plaintiff Mateo–Diego failed to respond to discovery requests and did not appear for trial. His claims are dismissed for lack of prosecution.

and consequently their salary was contingent solely on the decisions made by Johnston and his farm operation, without Alexander's input (see discussion below).

11. Johnston maintained a migrant labor camp on his property which housed members of Alexander's crew, including Plaintiffs. Johnston did not, in the ordinary course of his business, regularly provide housing on a commercial basis to the general public, despite his assertions to the contrary (Doc. # 37 at pp. 5–6, 47). *See* 29 U.S.C. § 1823(c). Thus, if a person resided at Johnston's camp, he was expected to work (*Id.* at p. 66).

12. In January 1989, during a "hard winter" (Doc. # 43 at p. 23), Johnston's camp was cited for major and minor violations [2] due to the lack of heating facilities, raw sewage on the camp grounds, holes in bedroom walls, floors and windows, lack of hot water and inoperable toilets. Following their identification, some of these conditions were repaired promptly by Johnston; others took several days to repair (*Id.* at pp. 18–19). All deficiencies at the camp were corrected by or paid for by Johnston without any contribution from Alexander (Doc. # 37 at p. 43).

13. In or about November, 1987, in North Carolina, Alexander recruited Barber and Hill for work with his crew on Johnston's farm during the 1987–88 vegetable season (Doc. # 36 at pp. 42, 69). In or about November, 1988, in North Carolina, Alexander recruited Barber, Hill, Leach and Lemons for work with his crew on Johnston's farm during the 1988–89 vegetable season (*Id.* at pp. 5–6, 43, 69; Doc. # 37 at pp. 67–68, 70). In or about November, 1989, in North Carolina, Alexander recruited Barber, Hill and Lemons for work with his crew on Johnston's farm during the 1989–90 vegetable season (Doc. # 36 at pp. 8, 43, 69). In each of these recruitments, Alexander failed to provide any Plaintiff with a written statement of the terms and conditions of the prospective employment (Doc. # 36 at pp. 7–8, 44–45, 69; Doc. # 39 at p. 8).

14. Lucille Jones ("Jones"), an employee of Alexander's, provided the workers with this disclosure upon their arrival at Johnston's camp. Ms. Jones would read the terms of employment to each member of Alexander's crew and would ask if the worker understood those terms. She then had the crew member sign a form indicating that they understood and accepted the terms of employment (Doc. # 43 at pp. 38–40). *See* Jt. Defts. Ex. 39 and 49 [3]. She also posted disclosures in vehicles, pay areas and eating areas (*Id.* at pp. 40–41).

15. Johnston and his brother made all decisions regarding the planting, irrigating and cultivating of his vegetable crops (Doc. # 37 at p. 13). Likewise, Johnston and his brother made all decisions concerning the application of pesticides and herbicides to the crops (*Id.* at p. 14); and regarding the sale and marketing of the crops produced on the farm (*Id.*). Johnston did not consult Alexander with regard to any of these matters (*Id.* at pp. 13–14).

16. Each work-day morning, Alexander received daily job assignments for his crew from Johnston or Johnston's foreman (*Id.* at pp. 79–80). Johnston or his foreman would specify the task or tasks to be performed by Alexander's crew that day, as well as the amount of work to be performed (*Id.* at pp. 79–81). Johnston testified, "I inform Mr. Alexander of which job that we're going to or what we will be doing the next day.... I will direct Mr. Alexander which direction he needs to go with the crew and what job they need to do." (*Id.* at pp. 14–15). Johnston further testified that he had the ability to split Alexander's crew between two activities, and instruct the crew through Alexander which particular crops needed the most attention based on market activity (*Id.* at pp. 26–28). Johnston stated that he could instruct Alexander to move his crew to other fields to find better produce. Alexander

---

2. Paul Raymond Fell, who testified on behalf of Defendant Johnston, distinguished a major violation as one which has the potential of having "adverse health effects." (Doc. # 43 at p. 16).

3. Interestingly, neither of these exhibits contains any of the Plaintiffs' signatures with the possible exception of Barber on Exhibit 49.

testified that Johnston's foreman would essentially supervise the crew's work, and give additional instructions or modifications to Alexander during the day on Johnston's behalf (*Id.* at pp. 85–87).

17. As noted above, Johnston's daily assignments were largely dependent on market activity. Occasionally, market conditions would cause Johnston to cease harvesting operations on his farm for short periods of time (*Id.* at pp. 15–18, 25–27). Johnston's decision would impact Alexander's crew by idling them until Johnston decided that market conditions warranted additional harvesting. As stated earlier, these marketing decisions were made solely by Johnston and his brother, without Alexander's input.

18. Johnston also decided whether his potato crop would be sold for use as table stock or for potato chips. This decision had a significant impact on Alexander's crew, since the crew was only utilized to grade potatoes which were sold for table stock. (*Id.* at p. 37). Again, Alexander had no input in this decision.

19. Johnston and his brother made all of the substantial capital investment to the operations on their farm. Johnston provided the buckets, bins, tractors, carts, bags and knives used in harvesting operations (*Id.* at pp. 22, 82–84, 86). He also furnished the packing and storing facilities, and provided the machinery used in the planting of the cabbage crop. The vehicles used to transport the crew were Alexander's sole significant piece of capital investment.

20. Johnston also invested substantial capital towards the operation and maintenance of his labor camp. This included paying for necessary repairs to the camp and supplying most of the appliances and furniture found in the camp (*Id.* at p. 43). In addition, Johnston bore the cost of all utilities used at the camp (*Id.*). Alexander did not invest any capital towards Johnston's labor camp.

21. Prior to a vegetable season commencing, Johnston and Alexander would agree upon a compensation arrangement whereby Johnston paid Alexander a flat fee which was not adjusted throughout the vegetable season to reflect any changes in the market price received for the vegetables (*Id.* at pp. 8–11). The fee was a flat rate based upon the volume of produce harvested, graded, packed and/or planted by the members of the crew with respect to the different vegetable crops (*Id.*). The fee was intended to compensate Alexander for transporting the agricultural workers, and paying the workers' wages, as well as paying all Social Security, unemployment compensation taxes and worker's compensation insurance due for the members of Alexander's crew.

22. As a consequence to his compensation agreement with Johnston, Alexander had no opportunity for profit or loss from his farm labor contracting business on Johnston's farm. His fee did not increase if the price received for the produce at market increased; conversely, he was paid his normal fee even if the produce was sold at a loss (*Id.*). Thus, Johnston and his brother bore all risk of loss with regard to the vegetables produced on their farm.

23. In 1990, Johnston gave Alexander an unsolicited raise in order for Alexander to continue paying his crew the minimum wage following its increase that year (*Id.* at pp. 11–12, 77–78). Alexander testified that without Johnston's raise, it would have been impossible for him to pay his crew the higher minimum wage rate (*Id.* at p. 78). Alexander further testified that Johnston only gave him a raise when the minimum wage was increased (*Id.* at p. 77).

24. In addition to his legal requirements, Alexander had certain responsibilities associated with his crew. These included: furnishing meals (including purchasing and preparing); transporting the crew; preparing and maintaining the payroll records; and remunerating the workers in the crew.

25. Alexander furnished meals to members of his crew while they resided at Johnston's migrant camp. The weekly charge for meals was generally in the $35.00 range, with occasional variations. Alexander deducted the charge for the meals from

the wages of those workers who consumed the prepared meals.

26. Alexander's wife, Mary Alexander, and Lucille Jones shopped for food intended for the crew. At trial, Alexander presented several grocery receipts to justify the meal charges deducted from the Plaintiffs' wages. Jt. Defts. Ex. 51, 52, 53. The receipts however, are incomplete, and the actual costs of furnishing the meals cannot be determined. In addition, Mrs. Alexander's testimony made it painfully clear to the Court that despite her contentions to the contrary, some purchases recorded on the proffered receipts were unrelated to the crew's meals, and some were not, in any way, for use by the crew (Doc. # 42 at pp. 45–63). In this regard, the Court finds Mrs. Alexander's testimony not credible.

27. Alcoholic beverages and cigarettes were provided to Alexander's crew on Johnston's farm (Doc. # 36 at pp. 9–11, 46–47, 69; Doc. # 39 at pp. 14–18). At least twice a day, a "line" was run at the labor camp (Doc. # 38 at pp. 8–17). Crew members could purchase beer, wine and cigarettes from the camp cook. Purchasers were charged as follows: $1.50 per half-pint, $3.00 per pint and $6.00 per fifth for wine; $1.00 per twelve ounce can and $1.50 per sixteen ounce can of beer; $1.75 per pack for cigarettes. Additionally, workers could obtain toilet paper, blankets and plates on a credit basis from the camp cook. The cook recorded all "line" purchases on a tablet, which was given to Alexander or his wife on Thursday (Id.). This tablet, which reflected purchases made from the preceding Sunday through Thursday was referred to as the "weekly bill." The "line" continued on Friday and Saturday; purchases made on these days were recorded by the cook separately from the weekly bill, and were referred to as the worker's "cash bill." Id. During the "line's" existence, Alexander never owned a license permitting him to commercially sell alcoholic beverages in the state of Florida (Doc. # 37 at p. 90)[4].

28. Defendants did not maintain any records reflecting the actual cost of items furnished in the "line" to the members of Alexander's crew, despite the fact that charges for these items were withheld from the crew's wages.

29. From 1987 to 1991, Alexander possessed a certificate of registration as a farm labor contractor issued by the Secretary of Labor ("Secretary"), pursuant to 29 U.S.C. § 1811. This certificate authorized Alexander to house migrant workers at Johnston's camp and to transport agricultural workers. At all times relevant to this action, except for the period from April 3 through May 15, 1989, Alexander was authorized to transport agricultural workers. Ptfs. Ex. 11. Alexander was unauthorized to transport agricultural workers during this period because he failed to submit proof of a successful safety inspection of his vehicle to the Department of Labor (Id.).

30. Alexander and members of his family prepared and maintained payroll records of the crew's labor on the Johnston farm. These payroll records reflected each worker's name, address and social security number; the number of hours worked per day; gross wages earned; withholdings made for Social Security (FICA) contributions; withholdings for meal charges, if any; and withholdings made for "cash advances" provided by Alexander. The payroll records were in triplicate; completed and signed copies were distributed to the worker, Alexander and Johnston respectively.

31. Initially, the Court finds the payroll records deficient for their inaccuracy in listing social security numbers. Specifically, Defendants listed different social security numbers on the payroll records of each Plaintiff except Leach. Some of these errors are arguably typographical errors. See Jt. Defts. Ex. 2. Hill's records, however, are wholly inadequate, listing three completely different social security numbers. See Jt. Defts. Ex. 1.

---

4. Johnston denied witnessing or having actual knowledge of the existence of the "line." (Doc. # 37 at p. 47).

32. As stated in Paragraph 26 above, Alexander failed to produce complete records to determine the actual costs of furnishing meals to the crew. Nevertheless, a weekly charge for meals was deducted from each worker's wages that consumed the prepared meals.

33. Alexander did not maintain records of the charges withheld from each worker's wages for purchases comprising either the weekly or cash bill. The charges on these bills were likewise not apparent on the payroll records issued to the crew members. The Court finds that Alexander enumerated the charges for the weekly bill under "cash advances" on the individual payroll records. The Court's decision in this regard is persuaded by the testimony of Mr. Halford S. Wright, Jr. ("Wright"), who previously served as an employment specialist with the Florida Department of Labor and Employment Security (Doc. # 43 at p. 26). Wright testified that his priority was to keep Alexander "in proper compliance with the various rules and regulations." (Doc. # 43 at p. 28) He further testified:

[BY MR. SCHELL]

Q. If a farm labor contractor sold beverages to workers and deducted that from pay, that should have been on [the payroll records] too, shouldn't it?

A. I don't think I—I don't think it would appear on those forms if it was with an alcoholic beverage unless they had a license to sell alcoholic beverages. I wouldn't put it on myself unless I had a license.

Q. Why wouldn't you put it on?

A. I don't have a license to do it.

Q. Because it would be illegal?

A. Well, that's what I said in my deposition, that—you asked me if it's a good management practice to furnish this beer and wine and I said yes, it was, and you just about went through the ceiling. It is a good management practice. But it is illegal as hell, and those are my exact words; it should appear in the deposition.

5. A notation below the signature line stated, "Signature of Worker Receiving Pay Verifies

Q. All right, Mr. Wright. So—but if a contractor was doing that, in fact he should have put it—he legally was required to list that?

A. He can put it down there under—as a cash forward or something like that, cash loan, he could have shown it that way.

Q. Even though it wasn't a cash loan?

A. Well, I don't know how. You can look at it two different ways. It's going to be cash at the end of the week when they got their check.

(Doc. # 43 at pp. 32–33); *see also* Doc. # 36 at p. 12 and Ptf. Ex. 6.

34. Every Friday, Johnston tendered a check to Alexander in accordance with their compensation arrangement. Alexander would take the check to the NCNB Bank, cash the check and use part of the proceeds to pay the crew (Doc. # 37 at p. 73).

35. Alexander paid his crew on Saturdays for their labor on Johnston's farm (*Id.* at p. 74). Alexander would withhold from each worker's wages federal withholding and, if applicable, the meal charge and the amount of the employee's weekly bill. These withholdings were listed on the payroll records as described in Paragraphs 30 and 33 above. At the time of payment, each worker would individually enter the labor camp's kitchen, sign their payroll record[5] and receive their net salary in cash together with a copy of their signed payroll record. The worker would then remit any "cash bill" amount.

## Conclusions of Law

Jurisdiction is conferred on this Court by 29 U.S.C. § 1854(a), for claims arising under the Migrant and Seasonal Agricultural Worker Protection Act, and by 29 U.S.C. § 216(b), for claims arising under the Fair Labor Standards Act. The Court finds that it has personal jurisdiction over Defendants Alexander and Johnston, and that venue is proper in the Middle District of Florida.

Above Information to be correct."

### I. MSAWPA Claims

#### A. Status of the Parties

##### 1. Plaintiffs' Status [6]

29 U.S.C. § 1802(8)(A) defines a migrant agricultural worker as "an individual who is employed in agricultural employment of a seasonal or other temporary nature, and who is required to be absent overnight from his permanent place of residence." *Id.* The regulations promulgated by the Secretary define a permanent place of residence as a "domicile or permanent home" which "does not include seasonal or temporary housing such as a labor camp." 29 C.F.R. § 500.20(p)(2).

The testimony at trial clearly demonstrated that the sole purpose for Johnston's labor camp was housing seasonal workers. In fact, the Defendants' testimony established a clear distinction between permanent, full-time employees of Johnston's that lived on Johnston's farm with the seasonal employees brought in by Alexander (Doc. #37 at pp. 44–45, 60).

Because Johnston's labor camp could not be any Plaintiffs' permanent places of residence as contemplated by the MSAWPA, the Court concludes that, at all times relevant to this action, the Plaintiffs were migrant agricultural workers.

##### 2. Defendants' status

■ It is uncontroverted that Alexander was a farm labor contractor as defined in 29 U.S.C. § 1802(7) at all times relevant to this action. In contrast, Johnston's status as an employer of Plaintiffs within the meaning of the MSAWPA and FLSA has generated considerable dispute. In this regard, Johnston could either be a direct employer or a joint employer for liability to attach under either Act. 29 U.S.C. § 1802(2) provides:

> The term "agricultural employer" means any person who owns or operates a farm, ranch, processing establishment, cannery, gin, packing shed or nursery, or

who produces or conditions seed, and who either recruits, solicits, hires, employs, furnishes or transports any migrant or seasonal agricultural worker. *Id.* The legislative history manifests Congress' intent that the word "or" in the phrase ". . . recruits, solicits, hires, employs, furnishes or transports . . ." means any one or all of the activities listed. *See* H.Rep. No. 97–885, 97th Cong., 2d Sess., page 5 (1982), *reprinted in* 1982 U.S.C.C.A.N. 4547, 4551 ("House Report").

■ The definition of "employer" under the MSAWPA includes the employment principles under the FLSA, 29 U.S.C. § 203(d) and (g). 29 C.F.R. § 500.20(h)(1)–(4). It is well established that the issue of whether an employment relationship exists under the FLSA, and the MSAWPA, must be judged by the "economic reality" of each individual case. *Donovan v. New Floridian Hotel, Inc.,* 676 F.2d 468, 470 (11th Cir.1982); *see also Rutherford Food Corp. v. McComb,* 331 U.S. 722, 729, 67 S.Ct. 1473, 1476, 91 L.Ed. 1772 (1947). The touchstone of economic reality in analyzing the possible employment relationship is economic "dependency." *Haywood v. Barnes,* 109 F.R.D. 568, 586 (E.D.N.C.1986), *citing, Castillo v. Givens,* 704 F.2d 181, 188 (5th Cir.), *cert. denied,* 464 U.S. 850, 104 S.Ct. 160, 78 L.Ed.2d 147 (1983). That Johnston may not have intended to create an employment relationship is irrelevant; "it is sufficient that one person 'suffer or permit [another] to work.'" *Donovan,* 676 F.2d at 471, quoting *Brennan v. Partida,* 492 F.2d 707, 709 (5th Cir.1974); *see also* 29 C.F.R. § 500.20(h)(1).

■ The statutory definition of "employer" under both the FLSA and the MSAWPA can encompass two or more individuals with respect to the same employee. *Hodgson v. Griffin and Brand,* 471 F.2d 235 (5th Cir.), *cert. denied,* 414 U.S. 819, 94 S.Ct. 43, 38 L.Ed.2d 51 (1973).

> The term "joint employment" means a condition in which a single individual

---

**6.** Apparently, Defendants no longer dispute the Plaintiffs' status as paragraph four on page one of their post-trial, proposed Final Judgment clearly states, "The Plaintiffs are migrant farm workers pursuant to 29 U.S.C. 1802(8)(a) [sic]." Nevertheless, the Court will dispose of this issue briefly.

stands in the relation of an employee to two or more persons at the same time. A determination of whether the employment is to be considered joint employment depends upon all the facts in the particular case. If the facts establish that two or more persons are completely disassociated with respect to the employment of a particular employee, a "joint employment" situation does not exist.

29 C.F.R. § 500.20(h)(4)(i); *see also* 29 C.F.R. § 791.2(b)(2), (3); *Maldonado v. Lucca*, 629 F.Supp. 483, 487 (D.N.J.1986).

■ In *Griffin and Brand*, the Fifth Circuit identified several factors which a court may consider when looking at the "economic reality" of a particular employment arrangement. Those factors have been specifically endorsed by Congress in determining the joint employment of farmworkers for FLSA and MSAWPA purposes. *See* House Report at 4553. The *Griffin and Brand* factors include: (1) whether the employment took place on the alleged employer's premises; (2) how much control the alleged employer exerted over the workers; (3) whether the alleged employer had the power to hire and fire workers or to modify their employment conditions; (4) whether the workers performed a "specialty job" within the line of production; and (5) whether the worker could refuse to work for the alleged employer or choose to work for others [7]. 471 F.2d at 237–38; *see also* 29 C.F.R. § 500.-20(h)(4)(ii)(A)–(E). "[The] absence of evidence of any one or more of the criteria listed [in *Griffin and Brand*] does not preclude a finding that an ... agricultural employer [is] a joint employer along with the crewleader." House Report at 4553 citing *Hodgson v. Okada*, 472 F.2d 965 (10th Cir.1973).

The Court concludes, based on the applications of its findings of fact to the foregoing factors, that Johnston was an agricultural employer under the MSAWPA and the FLSA. An examination of the *Griffin*

*and Brand* factors supports the Court's holding.

The first factor is obvious inasmuch as the Plaintiffs worked on Johnston's farm. Additionally, the workers in Alexander's crew resided in a labor camp owned and maintained by Johnston, without Alexander's financial assistance, even on utilities. *See* Findings of Fact ¶¶ 11, 20.

A review of the second factor establishes that Johnston maintained a significant degree of control over Alexander's crew. As found above, Johnston and his brother made all decisions regarding the planting, irrigating and cultivating of crops; the application of pesticides and herbicides; and decisions regarding the sale and marketing of the crops. These decisions were implemented through Johnston's daily assignments to Alexander and his crew. "The fact that [the employer] effected the supervision by speaking to the crew leaders, who in turn spoke to the harvest workers, rather than speaking directly to the harvest workers does not negate a degree of apparent on-the-job control over the harvest workers." *Griffin and Brand*, 471 F.2d at 238. The compensation arrangement between the Defendants further persuades a finding of substantial control. *Compare* Findings of Fact ¶¶ 21–23, *with* 29 C.F.R. § 780.331(b) ("the labor contractor is the employer of the workers if he makes the day-to-day decisions regarding the work and has an opportunity for profit or loss through his supervision of the crew and its output.").

The third factor, Johnston's ability to hire, fire or modify the conditions of the crew's employment, is less apparent. Although Johnston could not directly hire or fire a member of Alexander's crew, he had the ability to modify employment conditions considerably, including expulsion from his farm and/or labor camp. The Court finds that with respect to the fourth factor, Plaintiffs did not perform a specialty job on Johnston's farm. *See* Findings of Fact ¶ 10; *Beliz v. W.H. McLeod & Sons*

---

**7.** The fifth factor has never been applied in the agricultural context. *Maldonado*, 629 F.Supp.

at 488.

**1208**

*Packing Co.*, 765 F.2d 1317, 1328 (5th Cir. 1985); *Castillo*, 704 F.2d at 191.

In sum, the Court finds that Plaintiffs were ultimately economically dependent upon Johnston for their livelihood during the period they worked on his farm. The Court further finds that Johnston and Alexander were not completely disassociated with respect to the Plaintiffs' employment. Therefore, the Court concludes that Johnston was an agricultural employer under the MSAWPA.

### B. The MSAWPA Intentional Violation Standard

■ 29 U.S.C. § 1854(c)(1) provides for either actual or liquidated damages of up to $500.00 for each intentional violation of the Act. This standard was recently analyzed by this Circuit in *Cochran v. Vann, No. 91–3121 [1992 WL 103977] (11th Cir. May 12, 1992).*

> The proposition that knowledge of the Act's provisions is a *sufficient* condition for establishing intent does not imply the proposition that knowledge is a *necessary* condition for establishing intent, or conversely, that ignorance of the Act's provision precludes a finding of intent.

*Id.* at pp. 4–5; *see also Rivera v. Adams Packing Ass'n, Inc.*, 707 F.2d 1278, 1283 (11th Cir.1983) (under analogous provision in FLCRA, word "intentional ... refers to the standard by which a person may be held liable for the natural consequences of his or her acts.").

### C. Violations of AWPA

*1. Certificate of Registration Requirement*

a. Defendant Alexander

■ The MSAWPA requires those engaged in farm labor contracting activity to possess a valid certificate of registration

from the Secretary. 29 U.S.C. § 1811(a); 29 C.F.R. § 500.40. Plaintiffs assert, and the Court finds, that from April 3, 1989 through May 15, 1989, Alexander violated section 1811(a) by engaging in farm labor contracting activities without first obtaining the above-referenced certificate of registration. Findings of Fact ¶ 29. Plaintiffs offered into evidence the deposition of Davie L. Rabon ("Rabon"), the custodian of records from the Florida Department of Labor and Employment Security, Bureau of Agricultural Programs. Rabon's section in the bureau handled the registration and certification of farm labor contractors pursuant to an agreement with the United States Department of Labor. Rabon testified that from April 3, 1989 until May 15, 1989, Alexander was not authorized to transport agricultural workers due to his failure to submit an inspection report on his 1972 Ford bus. *See* Ptfs. Ex. 11 at pp. 12–14. Rabon further indicated that apparently Alexander was not notified by the agency. *Id.* Defendants did not address this issue at trial or in their post-trial, proposed Final Judgment [8].

The Court finds that Alexander violated section 1811(a) despite Rabon's testimony that he was never notified. Alexander was responsible for meeting certain requirements, and his failure to do so, by itself, violated the MSAWPA [9]. The failure of the proper governmental agency to inform Alexander is secondary.

b. Defendant Johnston

■ The MSAWPA commands Johnston to take "reasonable steps" to ensure that the farm labor contractor he uses has a valid certificate of registration. 29 U.S.C. § 1842. Plaintiffs allege that Johnston failed to meet the statutory requirement

---

**8.** Instead, Defendants state: "Plaintiffs assert that a violation of the foregoing (section 1841) resulted from their transportation by the Defendants without adequate insurance." *See* Doc. # 40 Attachment at p. 8. Although a violation of section 1841(b)(1)(C) was alleged in the Plaintiffs' Amended Complaint, this alleged violation was not pursued at trial, and was not addressed in the Plaintiffs' post-trial, Proposed Findings of Fact and Conclusions of Law. After examining

the file, however, it is clear that Defendants copied this argument verbatim from their original Proposed Findings of Fact and Conclusions of Law, filed December 4, 1991 (Doc. # 30 at pp. 6–7).

**9.** Apparently, Alexander had failed to comply with these MSAWPA requirements previously (Doc. # 43 at p. 27).

when he used Alexander to transport the crew during the time period indicated above. Plaintiffs claim that "Alexander's certificate of registration plainly lacked authorization for transportation and a cursory examination of the certificate would have revealed this fact:" Doc. # 35 at p. 26 ¶ 18.

Plaintiffs did not present any evidence to support their claim in this regard. In contrast, Johnston testified that he was cognizant of the MSAWPA, and understood its requirements; and that his regular practice required farm labor contractors to comply with these requirements (Doc. # 37 at pp. 46–47, 49). Based on the evidence, the Court finds that Defendant Johnston did not violate section 1842 of the MSAWPA.

### 2. Information and Recordkeeping Requirements

■ The MSAWPA imposes requirements on farm labor contractors and agricultural employers that recruit migrant agricultural workers. One such requirement commands Johnston and Alexander to provide their workers at the time of recruitment with the written terms and conditions of their future employment. 29 U.S.C. § 1821(a); 29 C.F.R. § 500.75(b). The Court must conduct a two-part inquiry: first, whether the Plaintiffs were recruited within the meaning of the MSAWPA; and second, if the Plaintiffs were recruited, whether the requirements of the MSAWPA were violated.

The MSAWPA's legislative history indicates that the term "recruits" encompasses activities that "run[ ] the spectrum from the actual pre-employment discussions between the recruiter and the migrant worker to the filing of job orders with the interstate recruitment system established by the Wagner–Peyser Act." House Report at 4559. *See also Contreras v. Mt. Adams Orchard Corp.*, 744 F.Supp. 1007 (E.D.Wash.1990) (term "recruit" and its derivatives means " 'to hire or otherwise obtain or secure the services of,' and ...

include[s] all pre-employment discussions that relate to a worker's employment.").

Defendants have asserted a blanket defense that Plaintiffs were not recruited because they were registered voters in Flagler County, and thus, residents of the State of Florida.[10] Defendants support this assertion on two grounds: first, in order to qualify to register to vote, a person must be "a permanent resident of Florida and of the county where he wishes to register," *see* Fla.Stat. § 97.041(1); second, the oath given to electors, and presumably taken by Plaintiffs states, in part, "I am qualified to register as an elector under the Constitution and laws of the State of Florida, and that I am a citizen of the United States and a legal resident of [Flagler] County, Florida." Fla.Stat. § 97.051(1). *See also* Fla. Const. Art. VI, Sect. 2.

Defendants' argument is unpersuasive. In order to properly register as a voter in Florida, a person must be "at least twenty-one years of age and ... *a permanent resident for one year in the state* and six months in a county." Fla. Const. Art. VI, Sect. 2 (emphasis added). There must also be an intention on the part of the voter that Florida shall be the voter's permanent home.

> [I]n order to be a qualified elector in Florida one must, among other things, have established the seat of his existence in Florida with the present intention that this State shall be his permanent home as distinguished from a temporary home. There must not only be the intention that some place in this state shall be home, but there must also be the actual physical removal of residence to this state with a corresponding abandonment of any residence outside of this state. Without a coexistence of the fact of residence in Florida and the intention to reside permanently in Florida, there is no legal residence as contemplated by the Constitution. See *Herron v. Passailaigue*, 92 Fla. 818, 110 So. 539; *Wade v.*

---

10. Barber specifically denied that he was registered to vote in the State of Florida (Doc. # 36 at p. 64). His denial was not disputed.

*Wade,* 93 Fla. 1004, 113 So. 374; and *Smith v. Croom,* 7 Fla. 81.

1953 Op. Att'y Gen. 053–68 (March 24, 1953). The Court concludes that Plaintiffs are not permanent residents of this state. It is the Court's opinion that Plaintiffs' registration to vote is more likely a product of the Defendants' anticipating litigation than it is the Plaintiffs' interest in participating in Florida's political process. Accordingly, the Court finds that the Plaintiffs were recruited within the meaning of the MSAWPA.

The Court next turns to whether the Defendants violated the requirements of section 1821(a). Each and every Plaintiff testified that Alexander did not provide the proper disclosure (Doc. # 39 at p. 8; Doc. # 36 at pp. 7, 44, 69). Nevertheless, Defendants failed to present any testimony to show that Alexander complied with the requirements of section 1821(a). In fact, Alexander, himself, did not testify to this. In light of this, the Court finds that Alexander violated section 1821(a)[11].

■ The Court further finds that Johnston violated section 1821(a). Alexander recruited only incident to Johnston's direction (Doc. # 37 at pp. 8, 68–69). It would be inequitable to conclude that Johnston could escape the Act's requirements while benefiting from Alexander's recruiting. Thus, the Court finds that Johnston, as well as Alexander, violated section 1821(a) as to all Plaintiffs in the 1987–88, 1988–89 and 1989–90 vegetable seasons. *See* Doc. # 36 at pp. 5–9, 44–45, 69; Doc. # 39 at p. 8; *Accord Aviles v. Kunkle,* 765 F.Supp. 358, 366 fn. 9 (S.D.Tex.1991).

■ The MSAWPA also required Johnston and Alexander to make, keep and maintain records containing specific information regarding the crew. 29 U.S.C. § 1821(d); 29 C.F.R. § 500.80 (records must also contain worker's name, permanent address and Social Security number).

In the Findings of Fact, the Court detailed the Defendants' serious deficiencies concerning the payroll records. *See* Findings of Fact ¶¶ 28, 30–33. Based on those findings the Court holds that Defendants violated section 1821(d)(1) by failing to maintain payroll records enumerating the proper withholdings deducted from Plaintiffs' wages. Defendants further violated section 1821(d)(2) by failing to provide Plaintiffs with accurate payroll records.

The MSAWPA also contains provisions mandating compliance with substantive federal and state safety and health standards relating to migrant housing. *See* 29 U.S.C. § 1823; 29 C.F.R. §§ 500.130–500.135. Section 1823(a) is applicable to Johnston because the Court has determined that his labor camp was not open to the general public. 29 U.S.C. § 1823(c); Findings of Fact ¶ 11. The evidence at trial established that during the 1988–89 vegetable season, serious violations of the MSAWPA existed at Johnston's labor camp. The Court finds that these violations were substantive in nature, and posed a direct threat to the health and well-being of the occupants. Accordingly, the Court finds that Johnston violated section 1823(a).

### D. MSAWPA Damages

The Court finds that all of the aforementioned Defendants' MSAWPA violations were intentional under section 1854(c)(1). Plaintiffs have elected to seek statutory damages under the Act. The awarding of statutory damages under the MSAWPA is left to the discretion of the court. *Beliz,* 765 F.2d at 1332. Under section 1854(c)(1), the Court may, but is not required to, award up to $500.00 for each violation committed by the Defendants. *Salazar–Calderon v. Presidio Valley Farmers Ass'n,* 765 F.2d 1334, 1346 (5th Cir.1985), *cert. denied,* 475 U.S. 1035, 106 S.Ct. 1245, 89 L.Ed.2d 353 (1986); *Castillo,* 704 F.2d at 197 fn. 37; *Aviles,* 765 F.Supp. at 367.

---

11. The fact that Alexander, and certain members of his family, may have distributed a statement of the terms of employment after the crew arrived at the Johnston farm is insufficient to satisfy the requirements of the MSAWPA. Findings of Fact ¶¶ 13–14. The disclosure require-

ments in the MSAWPA are designed to "ensure that workers to the greatest possible extent have full information about where they are going and what the conditions will be when they arrive, *before they begin the journey.*" House Report at p. 4560 (emphasis added).

■ Liquidated damages under section 1854(c)(1) may be awarded absent a showing of actual injury. *Alvarez v. Joan of Arc, Inc.*, 658 F.2d 1217, 1219 (7th Cir. 1981). This has two purposes: first, it allows plaintiffs to recover for harm they have suffered even though they cannot prove actual injury; second, it promotes compliance with the MSAWPA's requirements, thereby deterring future violations and abuses. *Bertrand v. Jorden*, 672 F.Supp. 1417, 1424 (M.D.Fla.1987), citing *Beliz*, 765 F.2d at 1332.

■ The Court has considered the following factors in order to award damages: (1) the nature and persistence of the violations—including whether the violations are substantive or technical; (2) the extent of the Defendants' culpability; (3) damage awards in similar cases; (4) the Defendants' ability to prevent future violations of the MSAWPA, *Beliz*, 765 F.2d at 1332–33; and (5) the applicability of awarding separate damages for each season.

*1. nature and persistence of the violations*

The Court has found that Defendants violated sections 1811, 1821(a), (d) and 1823(a). The Court further finds that these violations were substantive in nature. That is, they were "not mere technicalities but serious violations which denied Plaintiffs the substantive protections of the" MSAWPA. *Washington v. Miller*, 721 F.2d 797, 803 (11th Cir.1983).

The violations of sections 1821(a) and (d) persisted over three vegetable seasons. Specifically, the evidence showed that Defendants recruited migrant workers from 1987 to 1989 without making the required disclosure. Furthermore, the Plaintiffs' payroll records did not meet the statutory standard during the pertinent vegetable seasons. In contrast, the evidence did not show that either Johnston's violation of section 1823(a) or Alexander's violation of section 1811 was persistent.

*2. culpability of the defendants*

Clearly, Defendants were aware of the MSAWPA and its requirements for several years prior to the occurrence of these violations. Although Defendants abided by many of the MSAWPA's requirements, their violations did not result from "ignorance and misconceptions as to the state of the law," but rather from "an abusive disregard for the Plaintiffs' rights." *Aviles*, 765 F.Supp. at 368. These violations were clearly avoidable by the Defendants. This Court believes that an award of damages will deter Defendants from future violative conduct.

*3. damage awards in similar cases*

The maximum statutory award of $500.00 per violation under the MSAWPA and its predecessor the FLCRA has been upheld in at least two cases reviewed by the Eleventh Circuit. In *Washington v. Miller*, the Court awarded six plaintiffs $500.00 per violation for six violations, awarding a total of $18,000.00. 721 F.2d at 803. Likewise, in *Rivera v. Adams Packing Ass'n, Inc.*, the Court upheld an award of $500.00 per violation for failing to maintain proper payroll records. 707 F.2d at 1283.

*4. defendants' ability to prevent future MSAWPA violations*

There is nothing in the record to suggest that Defendants were unable to comply with the requirements of the MSAWPA. The statutory award is aimed at, and should be applied so as to promote future compliance with the Act. In this case, awarding even the statutory maximum would not be unfair or threatening to either Defendant.

*5. separate damage awards for each season*

Separate statutory damages may be awarded for similar MSAWPA violations occurring in successive vegetable seasons, provided the seasons constitute distinct and separate transactions. *See e.g., Rivera*, 707 F.2d at 1283; *Bertrand*, 672 F.Supp. at 1426; *Certilus v. Peeples*, 101 L.C. (CCH) ¶ 34,587 at 46,462 fn. 6, 1984 WL 3175 (M.D.Fla.1984); *Strong v. Williams*, 89 L.C. (CCH) ¶ 33,929 at 49,310, 1980 WL

8134 (M.D.Fla.1980). The Court has, earlier in this opinion, described Alexander's sequence of transporting his crew to different farms. Findings of Fact ¶ 18. The Court is of the opinion that each leg of this routine constituted a separate and distinct transaction. Accordingly, separate statutory damage awards for each season are appropriate.

Based on the foregoing, the Court awards each Plaintiff damages for the MSAWPA violations proven at trial as follows:

### 1987–88 vegetable season (Barber and Hill)

| | |
|---|---|
| Violation of 29 U.S.C. § 1821(a) | $500.00 |
| Violation of 29 U.S.C. § 1821(d)(1) | $500.00 |
| Violation of 29 U.S.C. § 1821(d)(2) | $500.00 |

### 1988–89 vegetable season (all Plaintiffs)

| | |
|---|---|
| Violation of 29 U.S.C. § 1821(a) | $500.00 |
| Violation of 29 U.S.C. § 1821(d)(1) | $500.00 |
| Violation of 29 U.S.C. § 1821(d)(2) | $500.00 |
| Violation of 29 U.S.C. § 1811 (Alexander only) | $500.00 |
| Violation of 29 U.S.C. § 1823(a) (Johnston only) | $200.00 |

### 1989–90 vegetable season (Lemons, Barber and Hill)

| | |
|---|---|
| Violation of 29 U.S.C. § 1821(a) | $500.00 |
| Violation of 29 U.S.C. § 1821(d)(1) | $500.00 |
| Violation of 29 U.S.C. § 1821(d)(2) | $500.00 |

Judgment is awarded to Plaintiffs and against Defendants jointly and severally, unless otherwise indicated, as follows:

| | |
|---|---|
| James E. Leach, Jr. | $1200.00 |
| John Barber, Jr. | $4200.00 |
| Charles Hill, Jr. | $4200.00 |
| James Lemons | $2700.00 |
| Total Award | $12,300.00 |

---

## II. FLSA Claims

The Plaintiffs' labor on Johnston's farm was subject to the minimum wage provisions of the Fair Labor Standards Act. Under the FLSA, Defendants were obligated to pay Plaintiffs the minimum wage then in effect: $3.35 per hour prior to April 1, 1990; $3.80 per hour between April 1, 1990 and March 31, 1991. 29 U.S.C. § 206(a)(1), (5). Their salary had to be compensated in cash or its equivalent, and "free and clear" subject to one exception. 29 C.F.R. § 531.35; *Washington,* 721 F.2d at 803. Defendants could withhold sums for the "reasonable cost" of furnishing the Plaintiffs with "board, lodging, or other facilities." 29 U.S.C. § 203(m); 29 C.F.R. §§ 531.2, 531.3.

 In order to prove a violation of the FLSA, an employee bears the initial burden of proving that he performed work for which he was not properly compensated. *Anderson v. Mt. Clemens Pottery Co.,* 328 U.S. 680, 66 S.Ct. 1187, 90 L.Ed. 1515 (1946).

> [A]n employee has carried out his burden if he proves that he has in fact performed work for which he was improperly compensated and if he produces sufficient evidence to show the amount and extent of that work as a matter of just and reasonable inference. The burden

then shifts to the employer to come forward with evidence of the precise amount of work performed or with evidence to negative the reasonableness of the inference to be drawn from the employee's evidence. If the employer fails to produce such evidence, the court may then award damages to the employee, even though the result be only approximate.

*Id.* at 687–88, 66 S.Ct. at 1192; *see also Olson v. Superior Pontiac–GMC, Inc.,* 765 F.2d 1570, 1578 (11th Cir.1985), *modified,* 776 F.2d 265 (11th Cir.1985).

■ Plaintiffs offered their payroll records into evidence in order to satisfy their initial burden of proof. Plaintiffs contend that their net wages [12] were substantially below the minimum wage because of various withholdings documented on their payroll records [13]. Specifically, Plaintiffs challenge the Defendants' entitlement to minimum wage credits on withholdings for meals or "line" items [14].

Although the minimum wage must normally be paid "free and clear," 29 C.F.R. § 531.35, in certain limited situations, an employer may claim a credit against minimum wage obligations for the reasonable cost of furnishing meals, lodging or other facilities to employees. 29 U.S.C. § 203(m). The employer has the burden of showing that he is entitled to any credits claimed under section 203(m). *New Floridian Hotel,* 676 F.2d at 474. The regulations promulgated by the Secretary define "reasonable cost" to be not more than the actual cost to the employer of the board, lodging, or other facilities customarily provided by him to his employees. 29 C.F.R. § 531.3(a). " 'Reasonable costs' does not include a profit to the employer or any affiliated person." 29 C.F.R. § 531.3(b). The regulations further require employers to preserve certain records of the cost incurred in furnishing board, lodging or other facilities. 29 C.F.R. § 516.27(a).

■ In this case, the Defendants failed to prove the reasonable cost of the meals which they furnished to the crew. The receipts offered into evidence were incomplete, and did not conform to the standard required in the regulations. Findings of Fact ¶¶ 26, 32; 29 C.F.R. § 516.27(a). Moreover, Defendants' claim that meal charges were closely estimated to reflect actual cost is simply inadequate under the law of this Circuit.

> [A]n employer's unsubstantiated estimate of his cost, where the employer has failed to comply with the record-keeping provisions of the FLSA, and where there has been no determination of reasonable cost by the Wage and Hour Division, does not satisfy the employer's burden of proving reasonable cost.

*New Floridian Hotel,* 676 F.2d at 475. Clearly, Defendants are not entitled to a minimum wage credit for furnishing meals.

The Defendants additionally cannot claim a credit with respect to any amounts that constituted the weekly bill. First, the Defendants have failed to produce *any* records relating to the cost of items sold in the "line." *See* Findings of Fact ¶ 33; *New Floridian Hotel,* 676 F.2d at 475; *Brennan v. Veterans Cleaning Service, Inc.,* 482 F.2d 1362 (5th Cir.1973). Second, Defendants are not entitled to a credit for alcoholic beverages sold in the "line" as these beverages were sold in violation of Florida law. *See Marshall v. Hunter,* 26 WH Cases (BNA) 160, 162 (M.D.Fla.1983).

■ The Court gives no effect whatsoever to the Plaintiffs' signatures on the payroll records. The evidence indicated that the Plaintiffs signed their records as a receipt of wages paid, rather than an acknowledgment of the accuracy of the information contained therein. In any event,

---

**12.** Plaintiffs do not contend that their gross wages were below the minimum wage. (Doc. # 35 at p. 44).

**13.** The evidence offered by the Defendants leads the Court to conclude that they are entitled to a credit for social security contributions pursuant to the Federal Insurance Contributions Act.

**14.** In this regard, the only "line" items documented on the payroll records could be amounts consisting of the "weekly" bill. "Cash" bill items were paid out of the net wages.

the Plaintiffs' signatures did not act as a waiver to any of the present claims. *See Brooklyn Savings Bank v. O'Neil,* 324 U.S. 697, 707, 65 S.Ct. 895, 902, 89 L.Ed. 1296 (1945) ("[T]o allow [a] waiver of statutory wages by agreement would nullify the purposes of the [FLSA].").

In conclusion, the Court finds that the Defendants were not entitled to minimum wage credits for withholdings made for meals or items sold in the "line." In an effort to award the proper damages without undue speculation, the Court will award each Plaintiff the amount of these withholdings deducted from the Plaintiffs' net wages, based on the payroll records in evidence.

■■■ Under the FLSA, Plaintiffs are also entitled to recover liquidated damages in an amount equal to that of the unpaid wages due. 29 U.S.C. § 216(b). Section 11 of the Portal-to-Portal Act provides employers with a defense to the mandatory liquidated damages provision and permits the court, "in its sound discretion," to award "no liquidated damages." 29 U.S.C. § 260. First, however, the employer has the burden of persuading the court that his failure to obey the statute was in good faith and predicated upon such reasonable grounds that it would be unfair to impose upon him more than a compensatory verdict. *Joiner v. Macon,* 814 F.2d 1537 (11th Cir.1987). An employer who knew or had reason to know that the FLSA applied cannot establish good faith as a defense. *Id.* at 1539. This Court's decision whether to award liquidated damages does not become discretionary until Defendants carry the burden of proving good faith. In other words, liquidated damages are mandatory absent a showing by Defendants of good faith. *Id.; EEOC v. First Citizens Bank,* 758 F.2d 397, 403 (9th Cir.), *cert. denied,* 474 U.S. 902, 106 S.Ct. 228, 88 L.Ed.2d 228 (1985).

The Defendants have failed to meet their burden. "[G]ood faith requires some duty to investigate potential liability under FLSA." *Washington,* 721 F.2d at 804, quoting *Barcellona v. Tiffany English Pub, Inc.,* 597 F.2d 464, 468 (5th Cir.1979). The evidence does not indicate any affirmative effort by the Defendants to ascertain and comply with the requirements of the FLSA.

Based on the evidence, and pursuant to the aforementioned procedure, the Court awards each Plaintiff damages for the FLSA violations proven at trial as follows:

| Plaintiff | Unpaid Wages | Liquidated Damages | Total FLSA Damages |
|---|---|---|---|
| James E. Leach, Jr. | $ 740.84 | $ 740.84 | $1,481.68 |
| John Barber, Jr. | $1,257.64 | $1,257.64 | $2,515.28 |
| Charles Hill, Jr. | $2,082.41 | $2,082.41 | $4,164.82 |
| James Lemons | $ 645.30 | $ 645.30 | $1,290.60 |
| Total Award | | | $9,452.38 |