James D. HODGSON, Secretary of Labor, United States Department of Labor, Plaintiff-Appellee,

v.

GRIFFIN AND BRAND OF McALLEN, INC., Defendant-Appellant.

No. 72-2441

Summary Calendar.*

United States Court of Appeals, Fifth Circuit.

Jan. 4, 1973.

Rehearing and Rehearing En Banc Denied March 9, 1973.

H. Hollis Rankin, III, H. H. Rankin, Jr., McAllen, Tex., for defendant-appellant.

Richard F. Schubert, Sol., U. S. Dept. of Labor, Washington, D. C., M. J. Parmenter, Regional Sol., U. S. Dept. of Labor, Dallas, Tex., Truett Bean, Carin Ann Clauss, Donald S. Shire, Attys., U. S. Dept. of Labor, Washington, D. C., for plaintiff-appellee.

Before THORNBERRY, COLEMAN and INGRAHAM, Circuit Judges.

THORNBERRY, Circuit Judge:

The Secretary of Labor brought this suit under 29 U.S.C.A. § 217 to enjoin Griffin and Brand of McAllen, Inc. from violating the minimum wage, record keeping, and child labor provisions of the Fair Labor Standards Act, 29 U.S.C.A. § 201 et seq. The district court after trial without a jury found that Griffin and Brand had violated the Act and issued an appropriate injunction. Griffin and Brand appeals and we affirm.

---

* Rule 18, 5th Cir.; see Isbell Enterprises, Inc. v. Citizens Casualty Co. of New York et al., 5th Cir. 1970, 431 F.2d 409, Part I.

The district court described appellant's method of doing business and relationship to the harvest workers in part as follows:

"Defendant Griffin and Brand of McAllen, Inc. is engaged in the cultivation, harvesting, handling, packaging and marketing of fruit and vegetables in various counties of South Texas, including Hidalgo County. Defendant owns and operates a large fruit and vegetable warehouse and packing establishment in McAllen, Texas, and conducts farming operations. There is no question, and defendant admits, that the farm produce handled by defendant is transported, offered for sale, and shipped in interstate commerce.

"Defendant Griffin and Brand engages in harvesting operations for onions, carrots, tomatoes, peppers and other crops. An efficient harvest naturally necessitates a great amount of manual labor, and the required labor force is drawn in large measure from both resident and migrant Mexican-American farm workers. Griffin and Brand, as do all others similarly engaged, obtains the services of these farm workers by dealing with so-called 'crew leaders.' 'Crew leaders' are aware of various locations at which these workers congregate or reside, and hence are able to secure them in substantial numbers on short notice. After a 'crew leader' contacts the laborers, he then transports them to the work site. A 'crew leader' usually only furnishes his truck or trucks, and he uses his truck or trucks not only to take the farm hands to the fields and back to their homes, but also uses the same to haul the harvest from the field to the shed.

"Griffin and Brand secures its necessary labor as follows: 'Crew leaders' in search of jobs contact an agent of Griffin and Brand. If there is work available on a certain day, Griffin and Brand's agent will tell the 'crew leaders' when and where the labor is needed. When the 'crew leaders' arrive at the job site with the harvesting crew, an agent of Griffin and Brand will tell each particular 'crew leader' in what area he is to deploy his crew.

"The 'crew leaders' are usually paid by defendant for the labor supplied with a weekly lump sum, often paid in advance. The 'crew leader' himself, not defendant, is responsible for meting out the earnings of the individual laborers. The 'crew leaders' are paid by what is known as a 'piece rate,' which means that they are paid so much per basket picked. The 'piece rate' varies with the size of the particular vegetable or fruit being harvested. The 'crew leader,' who is paid on this unit basis, in turn pays the laborers on a lower . . . basis, keeping the difference for himself.

\* \* \* \* \* \*

"The evidence shows that Griffin and Brand, at the suggestion of the Government, kept social security records on behalf of the harvest hands employed to harvest crops. Before the pay check was given to the 'crew leaders,' Griffin and Brand deducted the social security due from it. Forms were provided the 'crew leaders' by Griffin and Brand, on which they were to keep track of the number of baskets picked. The forms were used by defendant's bookkeeper to determine the amount of social security for each worker. This money, which included both the share of the harvest hand and the 'crew leader,' was then deducted and placed in an escrow account. Weekly reports were sent by Griffin and Brand's bookkeeper to an outside bookkeeper, who was retained to do the 'crew leader's' social security computations. This arrangement was found to be necessary, as the average 'crew leader' has little or no formal education and is totally incapable of seeing that social security is paid in behalf of the harvesting crews. At year's end, defendant's bookkeeper, on the basis of the outside bookkeeper's computations, paid the Government that requisite social security monies from the escrow account, paid the outside bookkeeper, and then refunded any remaining balance to the people designated by the bookkeeper as due a re-

fund. The check paying the social security to the Internal Revenue Service was a check drawn on defendant, with a separate check for each 'crew leader.' The 'crew leaders' signed the social security return, not the check."

Further, testimony indicated that appellant, through its field supervisors, exercises considerable control over the crew leaders and the harvest workers. Red Martin, the head field supervisor tells the crew leaders at what hour to begin work and assigns them a certain number of rows or patches to harvest each day according to the number of members in the crew. Martin tells the crew leaders the rate at which they should pay the harvest workers and whether to pay an hourly wage or a piece rate. Martin and other field supervisors oversee the harvest work in the fields each day and give instructions to the crew leaders, who pass them on to the harvest workers.

On these facts the district court concluded appellant Griffin and Brand was an employer, or a joint employer, of the harvest crews within the meaning of the Fair Labor Standards Act, and enjoined it from violating the child labor, minimum wage, and record keeping provisions of the Act in the future. Appellant does not dispute that the violations occurred, but vigorously denies that it is the employer or a joint employer of the harvest crews. Rather, it argues, the crew leaders, as independent contractors, are the sole employers of the crews. In addition, appellant contends the issuance of an injunction was improper even if it is a joint employer of the harvest crews.

## A. Employer-Employee Relationship

■ The independent contractor status of the crew leaders, if they are independent contractors, does not as a matter of law negate the possibility that Griffin and Brand may be a joint Em-

ployer of the harvest workers. "There may be independent contractors who take part in production or distribution who would alone be responsible for the wages and hours of their own employees," Rutherford Food Corporation v. McComb, 331 U.S. 722, 729, 67 S.Ct. 1473, 1476, 91 L.Ed. 1772 (1947), but independent contractor status does not necessarily imply the contractor is solely responsible for his employees under the Fair Labor Standards Act. Another employer may be jointly responsible for the contractor's employees. E. g., Boire v. Greyhound Corporation, 376 U.S. 473, 84 S.Ct. 894, 11 L.Ed.2d 849 (1964); [1] Mitchell v. Hertzke, 10th Cir. 1956, 234 F.2d 183; Fahs v. Tree-Gold Co-op Growers of Florida, 5th Cir. 1948, 166 F.2d 40.

■ Whether appellant is an employer of the harvest workers does not depend on technical or "isolated factors but rather on the circumstances of the whole activity." Rutherford Food Corporation v. McComb, *supra*, 331 U.S. at 730, 67 S.Ct. at 1477; it depends not on the form of the relationship but on the "economic reality." Shultz v. Hinojosa, 5th Cir. 1970, 432 F.2d 259, 264. This court has summarized the proper approach to be taken and some important factors to be regarded as follows:

"Whether a person or corporation is an employer or joint employer is essentially a question of fact. . . . In considering whether a person or corporation is an 'employer' or 'joint employer', the total employment situation should be considered with particular regard to the following questions: (1) Whether or not the employment takes place on the premises of the company?.; (2) How much control does the company exert over the employees?; (3) Does the company have the power to fire, hire, or modify the employment condition of

1. "Decisions that define the coverage of the employer-employee relationship under the [National] Labor [Relations] and Social Security acts are persuasive in the consideration of a similar coverage under the Fair Labor Standards Act." Rutherford Food Corp. v. McComb, 331 U.S. 722, 723, 67 S.Ct. 1473–1474 (1947).

the employees?; (4) Do the employees perform a 'specialty job' within the production line?; and (5) May the employee refuse to work for the company or work for others?"

Wirtz v. Lonestar Steel Company, 5th Cir. 1968, 405 F.2d 668, 669. Since the question of appellant's joint employer status is one of fact, it is subject to review under the "clearly erroneous" standard. Id. at 670.

■ We do not think the district court's conclusion in this case that appellant was a joint employer was clearly erroneous; on the contrary, we find that it was amply supported by the evidence. Of course, the work necessarily took place on appellant's premises. The testimony that appellant's field supervisors supervised the harvest work tends to indicate an employment relationship. The fact that appellant effected the supervision by speaking to the crew leaders, who in turn spoke to the harvest workers, rather than speaking directly to the harvest workers does not negate a degree of apparent on-the-job control over the harvest workers. The fact that appellant set the rate of pay of the harvest workers, decided whether crew leaders would pay a piece rate or an hourly rate in a given instance, and handled the social security contributions for the harvest workers also tend to indicate an employment relationship. Viewing the total work arrangement, we agree with the district court that appellant was a joint employer and thus responsible for the violations of the Fair Labor Standards Act.

B. Propriety of the Injunction

■ We should vacate the injunction in this case only if we conclude the district court abused its discretion. "Two factors to be considered in determining whether an injunction should issue are the employer's previous actions of noncompliance and the dependability of its promises for future compliance." Shultz v. Salinas, 5th Cir. 1969, 416 F.2d 412, 414. Testimony at trial indicated past violations of the Act and disagreement between appellant and compliance officers of the Department of Labor concerning its obligations under the Act to the harvest workers. Although an issue was created as to whether appellant at all times acted in good faith reliance on advice of counsel, the district court was competent to evaluate the testimony and determine the dependability of appellant's promise of future compliance. We find no abuse of discretion in the issuance of the injunction.

The judgment of the district court is in all respects affirmed.