**Nicolas CHARLES et al., Plaintiffs,**

v.

**John BURTON et al., Defendants.**

**Civ. No. 92–150–VAL (WDO).**

United States District Court,
M.D. Georgia,
Valdosta Division.

July 1, 1994.

---

Betty Walker Lanier, Michael Leo Monahan, Tifton, GA, Gregory S. Schell, Belle Glade, FL, for plaintiffs Nicolas Charles, Charite Asseigne, Miguel Aubout, Samson Germain, Marcel Jean–Baptiste, Alexandre Joseph, Marcel Joseph, Edner Philippe, Fito Pierre, Frankel Pierre, Fatami Fatami "Rita" Saint Fleur, Gerard Simeon, Lavius Lavius Dit Servius Vil, Jean Jacques Vytelle, Avelie Maissoneuve, as personal representative of the Estate of Jean J. Maissoneuve, Deceased.

Billy G. Fallin, Moultrie, GA, Robert Cyril Wilmot, Tifton, GA, for defendants John Burton, Felix Burton.

George T. Talley, Frank Thomas Young, Valdosta, GA, C. Saxby Chambliss, Moultrie, GA, for defendant Little Rock Produce, Inc.

Frank Thomas Young, Valdosta, GA, C. Saxby Chambliss, Moultrie, GA, for defendant Bobby R. Hall.

### ORDER

OWENS, District Judge.

On March 2, 1994, this court held an evidentiary hearing in the above-captioned case. Plaintiffs allege that defendants violated pro-

visions of the Migrant and Seasonal Agricultural Worker Protection Act, 29 U.S.C. § 1801 *et seq.*, and the Fair Labor Standards Act, 29 U.S.C. § 201 *et seq.* Defendants, however, assert that they are not subject to the requirements of these acts. After careful consideration of the arguments of counsel, the relevant case law, and the record as a whole, the court issues the following order.

## FACTS

John and Felix Burton are row crop farmers in Barney, Georgia. In their farming operations, the Burtons principally grow cotton, corn, soy beans, and peanuts. In 1990, however, the Burtons also decided to plant green beans and cucumbers. Pursuant to an agreement between the Burtons and Little Rock Produce Company ("Little Rock"), a local packing shed, and its owner, Bobby Hall, Little Rock supplied the seeds for the bean and cucumber crops, boxes for the harvest, and a trailer in which to transport the beans, in return for the Burtons' promise to market the crops through Little Rock. Under the agreement, the Burtons were responsible for procuring labor to harvest the bean crop, and Little Rock would provide the labor for the cucumber harvest.

To obtain a crew to harvest the 1990 bean crop, the Burtons contacted the Georgia Department of Labor. Through the Department of Labor, the Burtons came in contact with Wilner Luxama, a farm labor contractor. Luxama agreed to provide a labor crew for the Burtons' bean harvest. The 1990 harvest, however, took place too late in the season, and, consequently, Luxama's crew worked only half a day on the Burtons' farm.

The next year, Wilner Luxama and his labor crew returned to the Burtons' farm to harvest the 1991 bean crop.[1] Luxama's crew consisted of approximately twenty-five to thirty-five Florida-based migrant farmworkers. Each morning of the harvest, Luxama would gather his crew and transport them from their temporary housing in Ashburn, Georgia, to the Burtons' farm in Barney, Georgia.[2] At the farm, the Burtons would direct Luxama to the appropriate bean field. Once Luxama and his crew arrived in the field, however, Luxama would direct and supervise the actual harvest, including assignment of duties. John and Felix Burton were not involved in the direct supervision of the harvest, although they would check the progress of the harvest approximately two to three times a day.

As the beans were picked, the workers would place the beans in the boxes provided by Little Rock. The workers would receive a ticket for each box harvested. The Burtons paid Luxama a negotiated rate for each box of beans harvested. Luxama would then pay the workers a set price for each ticket the worker received. Luxama, however, did not maintain a payroll, or any other record concerning the workers involved in the harvest. At the end of each day, the beans were loaded onto a trailer owned by Little Rock and transported to Little Rock's packing shed, where the beans were then sold.[3] The 1991 harvest yielded 2,990 boxes of beans.

Because the Burtons were low on funds in 1991, Little Rock was required to advance the Burtons money to meet their labor costs. Under Little Rock's arrangement with the Burtons, those funds would be reimbursed from the proceeds of the bean sales, if sufficient funds existed. In 1991, however, the Burtons failed to make a profit on the bean crop; therefore, Little Rock's advances were not reimbursed.

At roughly the same time the bean harvest was taking place in 1991, the cucumber crop planted by the Burtons was being harvested by a crew supplied by Little Rock. The labor crew for the cucumber harvest was supervised by Ernesto Hernandez, a farm labor contractor employed by Little Rock.

1. There are no records, however, to indicate the dates on which the 1991 bean harvest took place.

2. Ashburn is located approximately fifty miles away from the Burtons' farm. The workers were responsible for securing their own housing in Ashburn, although Luxama would help them with the arraignments.

3. When produce arrives at Little Rock's packing shed, it is examined by a broker, who purchases the produce if it is of marketable quality. If the produce is of non-marketable quality, the broker notifies Little Rock, which then notifies the farmers to stop harvesting.

The cucumber harvest involved approximately thirty-seven workers over a two-day period.

In 1992, Wilner Luxama and his crew returned to the Burtons' farm to harvest the bean crop. On the morning of June 3, 1992, the pickup truck in which the workers were being transported overturned, killing the driver and two workers, with the remaining workers sustaining serious injuries.

On December 19, 1992, the injured workers, along with the personal representative of one of the deceased workers, brought suit against John Burton, Felix Burton, Little Rock Produce Company, and Bobby Hall, pursuant to the Migrant and Seasonal Agricultural Worker Protection Act ("AWPA"), 29 U.S.C. § 1801 *et seq.*, and the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201 *et seq.* Plaintiffs contend that defendants violated "registration, vehicle safety, vehicle insurance, recordkeeping, wage statement and wage payment provisions of the AWPA." (Compl. at 2.) Further, plaintiffs allege that defendants "violated the FLSA by failing to pay certain of the Plaintiffs any wages whatsoever for their labor...." (Compl. at 2.) Defendants, however, assert that they are not subject to the requirements of the AWPA and FLSA.

## DISCUSSION

The determination of whether defendants are subject to the requirements of the AWPA and the FLSA requires the court to address two issues. First, are defendants "employers" within the meaning of the AWPA and the FLSA? And second, if defendants are "employers" within the meaning of the AWPA and the FLSA, are they entitled to an exemption from the requirements of the Acts?

### I. Employer Status

Plaintiffs contend that defendants were "agricultural employers" within the meaning of the AWPA and, therefore, were subject to the statute's various requirements.[4] Plaintiffs bear the initial burden "of establishing the applicability ... of the Act ... by a preponderance of the evidence...." *Soliz v. Plunkett,* 615 F.2d 272, 274–75 (5th Cir.1980).

The AWPA defines the term "agricultural employer" as "any person who owns or operates a farm, ranch, processing establishment, cannery, gin, packing shed or nursery, or who produces or conditions seed, and who either recruits, solicits, hires, *employs,* furnishes, or transports any migrant or seasonal agricultural worker." 29 U.S.C. § 1802(2) (emphasis added). Further, "[t]he term 'employ' has the meaning given such term under section 3(g) of the Fair Labor Standards Act ... for the purposes of implementing the requirements of that Act." *Id.* § 1802(5). Therefore, although the court's discussion will focus on the definition of "agricultural employer" as it is used in the AWPA, the same analysis applies to defendants' status under the FLSA.

In the case *sub judice,* there is no dispute that plaintiffs were employed by Wilner Luxama, a farm labor contractor hired by Felix and John Burton. The employment relationship between Luxama and plaintiffs, however, does not preclude defendants from attaining the status of an "employer" within the meaning of the AWPA; that is, a "joint employment" situation may exist. *See* 29 C.F.R. § 500.20(h)(4)(i). "The term *joint employment* means a condition in which a

---

4. In their answer to plaintiffs' complaint, John and Felix Burton denied that they were "agricultural employers" within the meaning of the AWPA. However, early in discovery, in response to plaintiffs' first set of interrogatories, the Burtons admitted that they were "agricultural employers," as defined by the AWPA. Subsequently, at the evidentiary hearing, the Burtons contended that they were not "agricultural employers." Plaintiffs argue that the Burtons should be estopped to deny their status as "agricultural employers."

Rule 33 of the Federal Rules of Civil Procedure provides that "answers [to interrogatories] may be used [at trial] to the extent permitted by the rules of evidence." Fed.R.Civ.Pro. 33(c). In contrast, Rule 36, concerning requests for admissions, states that "[a]ny matter admitted under this rule *is conclusively established* unless the court on motion permits withdrawal or amendment of the admission." *Id.* 36(b). It is noteworthy that although Rule 36 provides preclusive effect to admissions, Rule 33 does not provide preclusive effect to answers to interrogatories. Accordingly, although the Burtons' response may be considered by the court as evidence on the issue of the Burtons' status under the AWPA, it is not necessarily conclusive on that issue.

single individual stands in the relation of an employee to two or more persons at the same time." *Id.* Plaintiffs contend that they were jointly employed by Luxama and defendants.

Plaintiffs have suggested that the legislative history of the AWPA indicates that the decision in *Usery v. Pilgrim Equipment Co.*, 527 F.2d 1308 (5th Cir.1976), is determinative as to the issue of defendants' status as "joint employers" under the AWPA and the FLSA. However, the legislative history of the AWPA does not support plaintiffs' contention. The legislative history of the AWPA recognizes that different standards will apply depending on whether "a defendant-employer/association asserts that the worker in question was not an employee but an independent contractor *or in the alternative that such worker was solely an employee of an independent contractor/crewleader.*" H.R.Rep. No. 97–885, 97th Cong., 2d Sess. 6–7 (1982), U.S.Code Cong. & Admin.News 1982, 4547, 4552, 4553. In the first situation, the legislative history does indicate that the decision in *Usery* is determinative. *Id.* at 7. However, in the second situation, when the defendant asserts that the migrant worker is an employee of an independent contractor, the legislative history suggests that the decision in *Hodgson v. Griffin & Brand of McAllen, Inc.*, 471 F.2d 235 (5th Cir.1973), is controlling. H.R.Rep. No. 97–885 at 7. The facts in the case *sub judice* fall within the second situation; that is, defendants assert that plaintiffs were "solely ... employee[s] of an independent contractor/crewleader [Wilner Luxama]" and that a joint employment situation did not exist. *Id.* The first situation does not encompass the concept of joint employment as contemplated by the AWPA. Accordingly, the factors set forth in *Hodgson* and its progeny provide the appropriate standard for this court's determination.

■ The decision in *Hodgson* lists five factors a court should consider in determining whether as a matter of "economic reality," an individual is a joint employer: (1) Whether the employment takes place on the premises of the defendant; (2) How much control does the defendant exert over the employees; (3) Does the defendant have the power to fire, hire, or modify the employment condition of the employees; (4) Do the employees perform a "specialty job"; and (5) Whether the employees may refuse to work for the company or work for others? *Hodgson,* 471 F.2d at 238. The decisions subsequent to *Hodgson* have expanded upon the original five factors. Among the factors now considered by the courts are:

(1) The nature and degree of control of the workers;

(2) The degree of supervision, direct or indirect, of the work;

(3) The power to determine the pay rates or the methods of payment of the workers;

(4) The right to hire, fire, or modify the employment conditions of the workers;

(5) Preparation of payroll and payment of wages;

(6) Investment in equipment and facilities'

(7) Opportunity for profit or loss;

(8) Permanency and exclusivity of employment;

(9) Degree of skill required to perform the job;

(10) Ownership of facilities where work occurred; and

(11) Whether the employee performs a "specialty job" integral to the business;[5]

*Id.* § 500.20(h)(4)(i); *Aimable v. Long & Scott Farms,* 20 F.3d 434, 439 (11th Cir. 1994); *Gilbreath v. Cutter Biological, Inc.,* 931 F.2d 1320, 1324 (9th Cir.1991); *Howard v. Malcolm,* 852 F.2d 101, 104 (4th Cir.1988); *Donovan v. New Floridian Hotel, Inc.,* 676 F.2d 468, 470 (11th Cir.1982); *Hodgson v. Griffin & Brand of McAllen, Inc.,* 471 F.2d 235, 237 (5th Cir.1973); *Leach v. Johnston,* 812 F.Supp. 1198, 1206 (M.D.Fla.1992). These factors, however, "are merely guidelines; 'they are not etched in stone and will not be blindly applied.'" *Gilbreath,* 931 F.2d at 1324 (quoting *Bonnette v. California*

---

**5.** The fifth factor set forth in *Hodgson*—whether the employees may refuse to work for the company or work for others—"has never been applied in the agricultural context." *Leach v. Johnston,* 812 F.Supp. 1198, 1207 n. 7 (M.D.Fla.1992).

*Health & Welfare Agency,* 704 F.2d 1465, 1470 (9th Cir.1983)). Rather, the court should examine these factors within the context of the "'circumstances of the whole activity.'" *Hodgson,* 471 F.2d at 237.

 Although the factors set forth above closely resemble the traditional common law test for determining whether an independent contractor relationship exists, it is clear that "independent contractor status does not necessarily imply the contractor is solely responsible for his employees under the [FLSA and the AWPA]. Another employer may be jointly responsible for the contractor's employees." *Id.*[6] Likewise, however, simply because an individual is employed by a farm labor contractor does not necessarily make that individual an employee of every person with whom the contractor contracts. *See Howard,* 852 F.2d at 105.[7]

 The Eleventh Circuit Court of Appeals has recently addressed the proper application of the eleven factors outlined above. *Aimable,* 20 F.3d at 436. In reviewing the factors, the Eleventh Circuit held that when the issue is one of joint employment status, factors six, seven, eight, and nine are not applicable. *Id.* at 443–444. "[These] factor[s] ... [are] not used to determine joint employment status ..., but rather to determine whether workers were employees or independent contractors." *Id.* at 443; *see also id.* at 444 ("[these factors] are of no value to joint employment determinations"). Accordingly, as the issue in the case *sub judice* is whether defendants were the joint employers of plaintiffs, the court will review plaintiff's employment status in light of the following factors:

(1) The nature and degree of control of the workers;

(2) The degree of supervision, direct or indirect, of the work;

(3) The power to determine the pay rates or the methods of payment of the workers;

(4) The right to hire, fire, or modify the employment conditions of the workers;

(5) Preparation of payroll and payment of wages;

(6) Ownership of facilities where work occurred; and

(7) Whether the employee performs a "specialty job" integral to the business.

### A. Nature and degree of control of workers

Plaintiffs suggest that the decision in *Leach v. Johnston,* 812 F.Supp. 1198 (M.D.Fla.1992), should guide the court in its determination of the nature and degree of control defendants maintained over plaintiffs. In *Leach,* the court found that the defendant farmer maintained a "significant degree of control" over the farm labor contractor's crew by virtue of the fact that the farmer "made all decisions regarding the planting, irrigating and cultivating of crops; the application of pesticides and herbicides; and decisions regarding the sale and marketing of the crops." *Leach,* 812 F.Supp. at 1207. "Control," however, must mean something more than simply a restatement of the farmer's role in agriculture. A farmer will almost always be responsible for decisions concerning "planting, irrigati[on,] cultivati[on,] ... application of pesticides and herbicides[, and] ... the sale and marketing of the crops." *Id.* In this regard, the decision in *Donovan v. Brandel,* 736 F.2d 1114 (6th Cir.1984), offers a definition of "control" more in line with the realities of agricultural employment; that is, "whether [the defendant] retain[ed] the right to dictate the manner in which the

---

**6.** "[T]he terms 'employee', 'employer' and 'independent contractor' [should] not be construed in their limiting common law sense." H.R.Rep. No. 97–885, 97th Cong., 2d Sess. 6 (1982), U.S.Code Cong. & Admin.News 1982, 4552.

**7.** In this regard, the court must reject the version of the "economic realities" test adopted by the court in *Leach v. Johnston,* 812 F.Supp. 1198 (M.D.Fla.1992). Under that formulation of the test, an employment relationship would be de-

fined on the basis of whether the plaintiff was "***ultimately*** economically dependent upon" the defendant. *Leach,* 812 F.Supp. at 1206, 1208 (emphasis added). If "ultimate economic dependence" was the determinative circumstance, the test, and the factors outlined above, would have little meaning in that every employee of a farm labor contractor could be found ultimately dependent for their livelihood on the individual who has hired the contractor.

details of the harvesting function are executed." *Donovan*, 736 F.2d at 1119.

Further, in *Aimable v. Long & Scott Farms*, 20 F.3d 434 (11th Cir.1994), the Eleventh Circuit Court of Appeals explicitly rejected the definition of "control" suggested by plaintiffs. *Aimable*, 20 F.3d at 440–41. In rejecting plaintiffs' definition, the Eleventh Circuit wrote:

> Although, at first glance, the ... factor may appear to encompass abstract notions of control such as th[ose suggested by plaintiffs], its focus is more properly limited to specific indicia of control....
>
> Control arises ... when the farmer goes beyond general instructions, such as how many acres to pick in a given day, and begins to assign specific tasks, to assign specific workers, or to take an overly active role in the oversight of the work.

*Id.* at 440–41.

In the case *sub judice*, there is absolutely no indication in the record that defendants Bobby Hall and Little Rock retained the "right to dictate the manner in which the details of the harvesting function [were] executed." *Donovan*, 736 F.2d at 1119. Further, although defendants John and Felix Burton retained a degree of control over the harvest in that they directed which fields would be picked, they maintained no control over the *manner* in which the beans were picked. The details of the harvest were left to Wilner Luxama.

### B. Degree of supervision, direct or indirect, of the work

"[T]estimony that [a defendant] supervised the harvest work tends to indicate an employment relationship." *Hodgson*, 471 F.2d at 238. According to Wilner Luxama, the Burtons would check the progress of a harvest perhaps two or three times a day. (Luxama Dep. at 43–44.) Luxama, however, was primarily responsible for the supervision of the workers. (Luxama Dep. at 43.)[8] Ac-

cordingly, although the record reveals that the Burtons maintained a degree of supervision over the work, that supervision was extremely limited. "[Plaintiffs'] infrequent assertions of minimal oversight by [the Burtons] do not rise to the level of supervision necessary to satisfy this factor." *Aimable*, 20 F.3d at 441. In addition, the record clearly indicates that defendants Bobby Hall and Little Rock maintained no supervision, direct or indirect, over the work of plaintiffs.

### C. Power to determine pay rates or the method of payment of the workers

How much plaintiffs were to receive for their work, when they were to receive payment, and the manner in which they were to receive payment, were decisions made by Wilner Luxama.[9] Plaintiffs, however, contend that because their rate of pay necessarily depended on the amount defendants paid Luxama, defendants in fact determined the pay rate of plaintiffs. Plaintiffs' contention is without merit. The Eleventh Circuit Court of Appeals has recently rejected this very argument. *See Aimable*, 20 F.3d at 442.

> [Plaintiffs'] argument follows the transitive property of geometry: first, [defendants] controlled the amount [Luxama] received; second [Luxama] controlled the amount [plaintiffs] received; therefore, [defendants] controlled the amount [plaintiffs] received. This relationship is validated, [plaintiffs] assert, by [Luxama's] refusal to pay [plaintiffs] more money unless he received more money from [defendants]. To summarize, because of [Luxama's] intransigence regarding pay increases, [plaintiffs] conclude that they were economically dependant upon—and thus employees of— [defendants].
>
> ...
>
> Unfortunately for [plaintiffs], the laws that bind the Euclidian world do not apply with

---

**8.** *See also* Pls.' Memo. Regarding Defs.' Entitlement to "Small Business" Exemption at 2 ("Luxama ... supervised [plaintiffs'] work ...").

**9.** "Luxama ... paid [plaintiffs] their wages. Luxama was paid an agreed-upon rate for his

services and from this amount paid the workers' wages and his operating expenses." (Pls.' Memo. Regarding Defs.' Entitlement to "Small Business" Exemption at 2.)

equal force in federal employment law; the [plaintiffs'] leap of logic is unfounded.

*Id.*

### D. Right to hire, fire, or modify the employment conditions of the workers

There is no evidence in the record that defendants had the authority to hire or fire the individual workers employed by Wilner Luxama. Further, in determining whether a defendant-farmer has the authority to modify the employment conditions of workers, courts have looked at factors such as who controlled the number of hours each employee would work, who determined the tasks each employee would perform, and who was responsible for the workers' housing. *See Aimable,* 20 F.3d at 442; *Bonnette v. California Health & Welfare Agency,* 704 F.2d 1465, 1470 (9th Cir.1983); *Leach,* 812 F.Supp. at 1207. In the case at hand, the amount of time Wilner Luxama's crew could work on the Burton's farm was determined by a variety of factors, including: the weather, the size of the beans, the size of the crew, the skill of the crew, and the acreage available. However, within the time allowed by these factors, Wilner Luxama controlled the number of hours each individual employee worked. Luxama also controlled the tasks each worker would perform. As pointed out by plaintiffs' counsel, not every worker involved in the harvest actually picked beans. For example, some workers were involved in the collection of the boxes and the distribution of the tickets. The decision as to who performed what task was left to Luxama, not the defendants.

Finally, according to Wilner Luxama, the workers were responsible for finding their own housing. Therefore, unlike the defendants in *Leach,* defendants in the case *sub judice* could not modify the housing arrangements of the workers. Accordingly, the record does not support a contention that defendants had the authority to modify the plaintiffs' employment conditions.

### E. Preparation of payroll and payment of wages

As discussed above, Wilner Luxama was responsible for the payment of wages to plaintiffs. In fulfilling this duty, however, Luxama did not prepare a payroll. Further, a payroll was not prepared by any of the defendants.

### F. Ownership of facilities where work occurred

There is no dispute that the work took place on the Burtons' farm. However, there is absolutely no evidence that any of the plaintiffs performed any work on the property of either Bobby Hall or Little Rock.

### G. Whether the employees perform a "specialty job" integral to the business

As plaintiffs "performed a line-job integral to the harvesting and production of salable vegetables," this factor tends to support a conclusion that plaintiffs were employees of defendants. *See Aimable,* 20 F.3d at 444.

After a careful review of the factors discussed above, the court finds that Bobby Hall and Little Rock Produce Company did not "employ" plaintiffs within the meaning of the AWPA. Further, the factors also strongly suggest that John and Felix Burton were not the "joint employers" of plaintiffs. The record indicates that the Burtons retained no direct control over the work of the harvesters, exercised only cursory supervision over the harvest, did not determine the workers' pay rate or the method of payment, did not have the authority to hire or fire the individual crew members, could not modify the employment conditions of the individual workers, did not pay the workers, and were not responsible for the preparation of a payroll. Plaintiffs, however, argue that the court should look beyond the significance of any particular factor and delve into the "economic reality" of the relationship. According to plaintiffs, the reality of the employment situation is that the migrant workers were economically dependent on defendants. As plaintiffs' counsel asserted at the evidentiary hearing, defendants retained ultimate control over when plaintiffs worked and the wage plaintiffs would receive for that work.

If the court were to accept plaintiffs' argument, however, every farmer who hired a farm labor contractor would become for

purposes of the AWPA and the FLSA a joint employer of the contractor's employees. An "economic reality" test that sweeps as broad as plaintiffs suggest is no test at all; it is a mere formality. The legislative history of the AWPA recognizes that there will be situations in which a farmer is not held to be the joint employer of a farm labor contractor's employees. *See* H.R.Rep. No. 97–885 at 7. The factors discussed above, although "merely guidelines," nonetheless give significant direction as to the resolution of defendants' status under the AWPA and the FLSA. Accordingly, after a careful review of the case law, the text of the acts, the legislative history, and the federal regulations, the court holds that John Burton, Felix Burton, Bobby Hall, and Little Rock Produce Company were not the "joint employers" of plaintiffs.

## II. Exemptions

As defendants John and Felix Burton do not fall within the AWPA's definition of a "joint employer," the issue of whether defendants are entitled to a "small business" exemption from the Act is moot. However, in order that the record might be complete as to all issues raised at the evidentiary hearing, the court will proceed to address the exemption issue.

■ 29 U.S.C. § 1803 provides, in part: "The following persons are not subject to [the requirements of the AWPA]: ... Any person, other than a farm labor contractor, for whom the man-days exemption for agricultural labor provided under section 13(a)(6)(A) of the ... [FLSA] is applicable." 29 U.S.C. § 1803(a)(2). The man-days exemption of the FLSA applies to "any employee employed in agriculture ... if such employee is employed by an employer who did not, during any calendar quarter during the preceding calendar year, use more than five hundred man-days of agricultural labor...." *Id.* § 213(a)(6). A "man-day" is "any day during which an employee performs any agricultural labor for not less than one hour." *Id.* § 203(u).

"An exemption from the coverage of the [FLSA] 'must be narrowly construed.' The exemptions must be applied only to those 'plainly and unmistakably within its terms and spirit.' " *Hodgson v. Colonnades, Inc.*, 472 F.2d 42, 47 (5th Cir.1973); *see also Donovan v. Williams Chemical Co.*, 682 F.2d 185, 191 (8th Cir.1982). Further, "[a]n employer who asserts it is exempt from the Act 'has the burden of establishing the exemption affirmatively and clearly.' " *Donovan*, 682 F.2d at 191.

■ The accident forming the basis of plaintiffs' claims took place in 1992. Accordingly, to determine if defendants John and Felix Burton are entitled to the "small business" exemption, the court must focus its inquiry on the preceding calendar year. Of the year 1991, only the second quarter—that is, April, May, June—presents an issue as to whether five hundred man-hours of agricultural labor were performed on the Burtons' farm.

The Burtons did not maintain records for the period at issue concerning the number of workers involved in the bean harvest, the dates on which the harvest took place, or the hours each harvester worked in the field. Consequently, the Burtons have attempted to meet their burden by indirect means.

According to the Burtons, the record establishes the following "variables":

(1) Fourteen acres of beans were planted;

(2) 2,990 boxes of beans were picked;

(3) The beans have a growth rate of 48–60 days;

(4) The beans have a 3–5 day window of commercial viability in which the beans must be picked;

(5) 30–32 workers were involved in the harvest;

(6) The harvesters work an average of eight plus hours each day; and

(7) A worker averages sixteen boxes per day. The Burtons contend that although a record was not maintained of the exact man-days worked, the above variables prove that it was not possible to have worked over five hundred man-days in the 1991 harvest. For example, the above figures indicate that if thirty-two workers, averaging two boxes per hour, worked eight hours a day to harvest 2,990 boxes of beans, it would take 5.84 days

to complete the harvest. The harvest, therefore, would have involved 186.88 man-days of agricultural labor. Further, the Burtons assert that even if the court were apply the above variables in varying degrees, the maximum man-days that would be possible is 427.14.

The Burtons' calculations, however, present a number of problems. First, the actual number of days on which the harvest took place in 1991 is unknown. Although the court can make a generalized assumption of the number of days of harvest on the basis of the window of opportunity and growth rates, the court has no way of knowing if the window of opportunity was adhered to by the Burtons, or if the weather, or other factors, affected the growth rate of the beans to a significant degree.

Second, the actual number of workers involved in the 1991 harvest is unknown. The record indicates that a range of anywhere from twenty-eight to thirty-four, or more, workers may have participated in the harvest. Accordingly, the court has no basis for limiting the range in the manner suggested by defendants.

Third, defendants' assertion that the "average" work day of a harvester is eight plus hours is irrelevant to a determination of the actual hours worked by each harvester in 1991. There is simply no record or testimony that in any way establishes the actual number of hours each harvester worked each day on the Burton's farm in 1991. Accordingly, the court is merely left to speculate over how many hours the harvesters "may" have worked in 1991. In light of defendants' burden on this issue, such speculation is unwarranted.

Fourth, although the harvesters may pick an average of two boxes of beans each hour, this figure is, as was the "average" workday figure, irrelevant to the question of how many boxes each worker actually picked in 1991. As the record indicates, the number of boxes an individual can pick in a day depends on a number of factors, including: the age of the harvester, the gender of the harvester, the experience of the harvester, the weather, and the quality of the beans. Because these factors heavily influence the productivity of any given individual, the court cannot accept the "average" productivity of a worker as the basis for an exemption.

Finally, the figures set forth by the Burtons do not take into account the man-days involved in the 1991 cucumber harvest. The records maintained by Ernesto Hernandez indicate that the cucumber harvest involved an average of thirty-seven workers over a two day period in June 1991. Therefore, the calculation of man-days involved in the bean harvest must begin with the fact that seventy-four man-days of agricultural labor were expended in the cucumber harvest. As discussed above, using the "variables" set forth by the Burtons, it is possible that in 1991, 427.14 man-days of agricultural labor were involved in the bean harvest. Accordingly, if the cucumber harvest is added into the bean harvest total, the man-days exceed five hundred.

The indirect means by which the Burtons have attempted to show their entitlement to the small business exemption rests on assumptions with no firm support in the record. The record gives rise to a wide variety of man-day calculations, none of which has a greater validity than any other. Accordingly, the Burtons have not shown "affirmatively and clearly" that they are entitled to the small business exemption.

### CONCLUSION

Defendants John Burton, Felix Burton, Bobby Hall, and Little Rock Produce Company did not "employ" plaintiffs within the meaning of the AWPA and the FLSA. Further, although the issue is moot because of the holding in Part I of this order, the court holds that defendants John and Felix Burton are not entitled to the small business exemption.

SO ORDERED.