Tomas Clemente ALVISO–MEDRANO, et al., Plaintiffs,

v.

Roger HARLOFF, et al., Defendants.

No. 93–1111–CIV–T–17C.

United States District Court, M.D. Florida, Tampa Division.

Oct. 28, 1994.

Margaret Eileen Hennessy, Gregory Scott Schell, Florida Rural Legal Services, Belle Glade, FL, David J. Sales, Jack Scarola, Searcy, Denney, Scarola, Barnhart & Shipley, West Palm Beach, FL, Robert Alan Williams, Florida Rural Legal Services, Inc., Tallahassee, FL, for plaintiffs.

John J. Pappas, Ronald Steven Rawls, Diane M. Walia, Butler, Burnette & Pappas, Tampa, FL, Robert Alan Farrance, Richard Gadsden Groff, McGuire & Parry, Bradenton, FL, for defendants.

### ORDER

JENKINS, United States Magistrate Judge.

THIS CAUSE comes on for consideration of Defendants' Motion for Partial Summary Judgment (Dkt. 26), Plaintiffs' Motion for Partial Summary Judgment (Dkt. 29), Defendants' Supplemental Motion for Summary Judgment (Dkt. 44), Plaintiffs' Motion for Leave to Substitute Expert Witness (Dkt. 60), and the responses thereto.[1] A hearing was held on October 20, 1994.

### I

Plaintiffs, who are migrant farm workers, brought this action seeking unpaid back wages, damages and equitable relief under the Migrant and Seasonal Agricultural Worker Protection Act (AWPA), 29 U.S.C. § 1801 *et seq.*, the Fair Labor Standards Act (FLSA), 29 U.S.C. § 201 *et seq.*[2] While the FLSA regulates labor conditions imposing duties on employers, the AWPA imposes additional duties upon agricultural employers.

Plaintiffs allege that during their employment harvesting tomatoes in April 1990, defendants denied them substantive benefits guaranteed by these laws. Plaintiffs also contend that injuries they sustained while being transported to defendants' fields on April 3, 1990, were caused by defendants' violations of the transportation and licensing provisions of the AWPA.

Both parties have moved for summary judgment on two primary liability issues. The first issue is whether defendants were joint employers of the plaintiff laborers. The second issue is whether defendants "caused" plaintiffs to be transported in a van which was involved in an accident on April 3, 1990, causing injuries to certain plaintiffs.

Plaintiffs argue that defendants are liable under the AWPA and FLSA because they employed plaintiffs or are joint employers with the farm labor contractor, Raymond Ramiro Rodriguez, Sr. Plaintiffs argue that the sole test is whether the plaintiffs were "economically dependent" upon the defendants. (Dkt. 30, p. 10). Plaintiffs also argue that economic dependence turns on who con-

---

1. The parties have consented to proceed before the Magistrate Judge pursuant to Title 28, United States Code, Section 636(c) and Fed.R.Civ.P. 73.

2. Nine out of the fifteen original plaintiffs settled dismissing Counts II and III. Defendants Roger Harloff Farm, Inc., Harloff Farms, Inc., and Harloff Farms East Tennessee were also voluntarily dismissed from this lawsuit. Roger Harloff d/b/a Roger Harloff Farms and Roger Harloff Packing, Inc. remain as defendants.

trols the amount of work available and the amount of money the farm laborers can earn.

Defendants deny liability contending that they did not employ the plaintiffs. Instead, they contend that Rodriguez, Sr., the farm labor contractor, is the plaintiffs' employer. Defendants argue that the five regulatory factors outlined in the AWPA support the conclusion that no joint employment relationship exists and rely heavily on *Aimable v. Long and Scott Farms*, 20 F.3d 434 (11th Cir.1994).

■ Courts will dispose of actions when there is no genuine issue as to any material fact or which involve only a question of law. *See* Rule 56(a), Fed.R.Civ.P.; *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Whether defendants are joint employers of the plaintiffs and whether plaintiffs are employees of defendants under the AWPA and FLSA is a question of law. *Aimable*, 20 F.3d at 440; *Donovan v. New Floridian Hotel, Inc.*, 676 F.2d 468, 471, n. 4 (11th Cir.1982). Whether defendants employed plaintiffs in their tomato harvesting operation is thus appropriate for summary judgment determination.

■ Plaintiffs bear the initial burden of establishing the applicability of the AWPA's definition of agricultural employer within the meaning of the AWPA. *See Charles v. Burton*, 857 F.Supp. 1574, 1577 (M.D.Ga.1994) (citation omitted). The definition of employer is the same under the FLSA. *Id.* (citation omitted).

The recent Eleventh Circuit opinion, *Aimable*, sets the standard for determining whether an employer/employee relationship exists for purposes of federal welfare legislation. In *Aimable*, Long & Scott Farms ·(the farm) owned and operated a vegetable farm in Florida and Frank Scott, a one-half owner, managed the day-to-day operations of the farm. The farm hired John Miller as a farm labor contractor who was to provide workers to harvest the farm's crops.

The issue presented was whether a farm, which hired a farm labor contractor, was the joint employer of laborers under the AWPA and FLSA. After finding that the farm was not the laborers' joint employer, the district court entered summary judgment in favor of the farm. The Eleventh Circuit affirmed.

The AWPA regulations define joint employment as "a condition in which a single individual stands in the relation of an employee to two or more persons at the same time. A determination of whether the employment is to be considered joint employment depends upon all the facts in a particular case." 29 C.F.R. § 500.20(h)(4)(i). In its analysis, the *Aimable* court considered the " 'economic reality' of all the circumstances concerning whether the putative employee is economically dependent upon the alleged employer." *Id.* at 439. The court applied the five regulatory factors provided as guidelines in the AWPA regulations, as well as additional factors derived from legal decisions. *Id.* at 440.

■ The five relevant regulatory factors considered by the *Aimable* court include: (1) the nature and degree of control of the workers; (2) the degree of supervision of the work; (3) the power to determine the pay rates or the methods of payment of the workers; (4) the right, directly or indirectly, to hire, fire, or modify the employment conditions of the workers; and (5) preparation of the payroll and the payment of wages. *See* 29 C.F.R. § 500.20(h)(4)(ii).

The *Aimable* court cautioned that six other factors gleaned from legal decisions should only be considered if relevant to the factual circumstances of the case. They include: (1) investment in equipment and facilities; (2) the opportunity for profit and loss; (3) permanency and exclusivity of employment; (4) the degree of skill required to perform the job; (5) ownership of property or facilities where work occurred; and (6) performance of a specialty job within the production line integral to the business. *Id.* at 439.

The court first considered the nature and degree of control over the workers, focusing on specific indicia of control such as "direct employment decisions such as whom and how many employees to hire, whom to assign to specific tasks, and how to design the employees' management structure." *Id.* at 440. Because it was the farm labor contractor's responsibility to perform these functions, the

court found that Miller exercised sole control over the laborers and their employment. The court further held that agricultural decisions can not be likened to control. "Control arises, we believe, when the farmer goes beyond general instructions, such as how many acres to pick in a given day, and begins to assign specific tasks, to assign specific workers, or to take an overly active role in the oversight of the work." *Id.* at 441. The court concluded that the first regulatory factor did not support a finding of joint employment because although the farm may have indirectly affected employment, such control was not direct or substantial. The court found that the ultimate control and majority of picking decisions rested with Miller.

The court found that the second regulatory factor, the degree of supervision of work, also supported the farm's position. Although there was evidence that farm employees occasionally exercised some minimal control over some of the laborers, the laborers acknowledged that Miller and his hired employees served as the direct supervisors and were directly responsible for overseeing the work. The court found any supervision by the farm to be minimal. For instance, although laborers testified that a farm employee came out to the field on a regular basis, the evidence showed that such employees rarely provided any direction to the laborers' work. The court held, "infrequent assertions of minimal oversight by Long & Scott do not rise to the level of supervision necessary to satisfy this factor." *Id.* Because the farm left supervision and oversight to Miller and his crew, the court declined to confer joint employment status on the farm.

The third regulatory factor, the power to determine the pay rates or methods of payment to the laborers, was also deemed relevant by the court. Miller was paid by the farm but he alone determined what portion of his revenue to expend on labor, housing, and equipment. More importantly, Miller determined what wages to pay the laborers and the method of payment, i.e. hourly or piece-rate. The farm had no power to set or increase the laborers' wages, and had no influence over how Miller apportioned his earnings. The laborers were thus economically dependent solely on Miller.

In *Aimable*, the laborers conceded that the right, directly or indirectly, to hire, fire, or modify their employment conditions did not support a finding of joint employment. The farm never mandated a particular individual be hired or fired, it never shifted a worker from one pay classification to another or one task to another, and it never dictated the hours any laborer could work. Therefore, evidence regarding the fourth regulatory factor demonstrated the laborers' economic dependence on Miller and not the farm. *Id.* at 442.

Regarding the last regulatory factor, preparation of payroll and the payment of wages, the court found that Miller was solely responsible for calculating and paying the laborers' wages. The farm did not participate in this aspect of its harvesting business. After concluding that the five regulatory factors weighed against a finding of joint employment status, the court went on to consider the non-regulatory factors.

The court found that only the last two non-regulatory factors were relevant. It held that investment in equipment and facilities, the opportunity for profit and loss, permanency and exclusivity of employment, and the degree of skill required to perform the job were irrelevant because they showed only that they were employees but not of whom. The court noted that these factors are used in the context of determining whether employees were independent contractors where there was no farm labor contractor. The court excluded these factors from its analysis because they failed to bear on the issue of whether the farm was a joint employer.

It was undisputed that the laborers worked on land owned by the farm. The court stated that this was the first relevant non-regulatory factor. Moreover, the last factor, performance of a specialty job integral to the business, also was held to support the laborers because they performed a line job integral to the harvesting and production of tomatoes. *Id.* at 443.

After limiting the inquiry to the probative factors, the court held that although two of

non-regulatory factors favored the laborers, the five regulatory factors demonstrated that the laborers were not economically dependent upon the farm but upon Miller. It concluded by holding that no joint employment relationship existed. *Id.* at 442–444.

*Aimable* provides the proper inquiry for determining whether defendants are joint employers of the plaintiffs. This court will first consider the five regulatory factors.

**(1)** *The nature and degree of control of workers*

The *Aimable* court held that this factor is concerned with specific evidence of control and not abstract concepts of control. *Id.* at 440. Defendants hired farm labor contractors, known as crew leaders, who were responsible for hiring and providing enough workers to pick the fields. They were also responsible for transporting their crews to the farms. The crew leader in this case, Rodriguez, Sr., owned his own bus, carried insurance on it and was responsible for transporting the workers to the fields. The crew leaders recruited and directly supervised their own crews. (Dkt. 33, pp. 6–7). In order to work, an individual needed the crew leader's approval. (Dkt. 33, pp. 7, 10).

The crew leaders supervised the pickers telling them which rows to pick, how far up the bush to pick, and the type of tomato to pick. (Dkt. 32, p. 18). The crew leaders checked the work and made sure that enough pickers were present each day. (Dkt. 33, p. 7). If Harloff Farms did not have enough work on any given day, the crew leaders could take their workers to other farms. (Dkt. 32, p. 46). In fact, the crew leaders had the discretion to go to other farms whenever they wished but the farm might decide not to employ the crew leader anymore. (Dkt. 32, p. 46). Moreover, the workers decided if they would work. If they did not like the price they were to be paid on any given day, they would not get on the bus to go to work. (Dkt. 35, p. 23).

As in *Aimable*, defendants did not decide who to hire, whom to assign to specific tasks, nor the management structure of employees. There is evidence that the farm would tell the farm labor contractor about how many people were needed and which crops to harvest at a particular time. Such general instructions, even if present in this case, constitute agricultural decisions which are not viewed as a measure of control.[3] *See Aimable,* 20 F.3d at 440.

There is no evidence that defendants gave specific instructions to the workers, assigned specific tasks, or took an overly active role in supervising the work. Therefore, because defendants did not have direct or substantial control over the workers, the first regulatory factor supports defendants' argument that they are not a joint employer.

**(2)** *The degree of supervision of work*

This regulatory factor also weighs against a finding that defendants were plaintiffs' joint employer. There is evidence that the farm manager, David Harloff, was out in the fields daily. (Dkt. 33, p. 25–26). However, he was not present to directly supervise the laborers but to oversee the fertilizing, spraying, and planting of new crops. (Dkt. 33, p. 19). Harloff told the crew leaders which fields to harvest on a daily basis. (Dkt. 32, p. 17) The crew leaders were responsible for directly overseeing the laborers' work. They would walk behind the pickers to ensure that they were doing a good job. (Dkt. 33, p. 19). If Harloff saw any problems with the quality of the tomatoes picked he would tell the crew leader and it was then the crew leaders job to correct any problems with his crew. (Dkt. 32, p. 19) Any supervision by Harloff was minimal and did not rise to the level of supervision necessary to satisfy this factor. *Aimable,* 20 F.3d at 441; *Charles,* 857 F.Supp. at 1580.

**(3)** *The power to determine the pay rates or methods of payment*

This factor concerns the defendant—farmer's control over the workers' compensation.

---

3. The evidence is conflicting as to whether the crew leader or the farm manager, determines how many laborers are needed on a given day.

(Dkt. 32, p. 30; Dkt. 35, p. 10) However, this factor alone is not dispositive of the joint employer issue.

*Aimable,* 20 F.3d at 442. In the instant case the crew leader, Rodriguez, Sr., was paid a flat rate per thousand pounds of tomatoes. This figure remains constant throughout the season regardless of market conditions. (Dkt. 32, p. 31) John Tipton, the controller and secretary treasurer of the farm, stated at his deposition that the per bucket rate was between the crew leader and his crew. (Dkt. 32, p. 20). The leader paid his crew out of his pay.

However, David Harloff, the farm manager, testified that the workers are generally paid at a piece rate which the crew leaders can vary. (Dkt. 33, p. 14). Harloff decides what the piece rate will be for the crew leaders. In addition to the piece rate, the farm labor contractors get paid per pound for their harvesting. They get a different piece rate within the amount paid per pound and all of their expenses come out of that per pound amount. (Dkt. 33, p. 14). The farm manager set an hourly rate for planting and a piece rate for the actual harvesting which the crew leaders could not change. (Dkt. 33, p. 15). If workers were unhappy with the rate of pay, they would not work that day. (Dkt. 35, p. 23; Dkt. 33, p. 15).

The farm kept payroll records on the crews. (Dkt. 32, p. 33–44). The crew leaders could set the piece rate but if it did not amount to minimum wage the farm would notify the crew leaders and the crew leaders were supposed to pay the laborer the difference. If the worker's piecework did not reach minimum wage, the worker would be paid based on the hours, according to Tipton. (Dkt. 32, p. 41–44). The farm would not pay this difference.

Plaintiffs emphasize the third factor that because the farm controlled the amount of money the laborers could earn, they were economically dependent upon the farm. The *Aimable* court rejected this argument as overbroad, finding that although the farm necessarily determined how much work was available, that fact alone was insufficient to establish that the farm was the laborers' employer. *Id.* at 439.

However, in this case the indicia of control over compensation is stronger than in *Aimable.* The farm indirectly insured that work-ers would be paid minimum wage. It also determined whether the workers would be paid an hourly rate or a piece rate, depending on the agricultural activity which was being conducted on the farm at the time. Although the farm was not responsible for providing the workers' housing and did not decide the exact amount of pay (apart from the minimum wage issue), the farm's involvement in minimum wage and setting the rate of pay makes this case more factually similar to *Hodgson v. Griffin and Brand of McAllen Inc.,* 471 F.2d 235, 237 (5th Cir.), *cert. denied,* 414 U.S. 819, 94 S.Ct. 43, 38 L.Ed.2d 51 (1973), and the cases it relies on rather than *Aimable.* This regulatory factor weighs in favor of joint employer status.

### (4) *The power to hire, fire or modify employment conditions*

The defendants have no input in the actual hiring and firing of the laborers. Defendants do require that the workers be legally employable and the crew leader must provide documentation for the workers which Glenna Harloff reviews. (Dkt. 33, p. 21) If a worker does not provide the proper documentation the crew leader is notified and the laborer has so many days to produce the required documentation. Otherwise, the farm will tell the crew leader to "get rid of the worker". (Dkt. 35, p. 38–39).

The farm manager determined the hours that the work began and ended. (Dkt. 33, p. 13–14; Dkt. 35, p. 29) However, the crew leader assigned specific tasks to the laborers on a daily basis and decided which workers to hire. Although it is a close call, on balance this factor does not show a joint employer relationship. *See Aimable,* 20 F.3d at 442.

### (5) *Preparation of payroll and payment of wages*

Defendants concede that the farm was involved in the calculation of wages. The farm labor contractors provided the farm with payroll information such as the hours worked and the compensation paid to each employee. The farm then computed the amount paid to each employee. (Dkt. 32, p. 33). The crew

leaders could elect to have the farm deduct social security from their wages and if requested, the farm would calculate the deductions and deposit them into an account under the crew leader's federal employer's identification number. The employer's matching share of social security was paid by the crew leader, not the farm. The farm provided a computer-generated pay statement issued under the company name showing the crew leader's name, the employee's name, and the gross and net wages and deductions. (Dkt. 32, p. 38–39). Because of defendants' participation in the payroll, this factor supports joint employer status for defendants.

As in *Aimable*, only two of the six non-regulatory factors are relevant to the instant analysis. It is undisputed that the laborers worked on land controlled by the defendant under a long-term lease. Moreover, the laborers were performing a job integral to the business of harvesting and production of tomatoes. These non-regulatory factors weigh in favor of a joint employment relationship.

In *Aimable*, none of the five regulatory factors favored plaintiffs although the two relevant non-regulatory factors did. The distinguishing features in this case are the defendants' extensive involvement in payroll, insuring that legal requirements (minimum wage, legal status) are met for the workers, and determining the method of pay (piece work or hourly rate) as well as the hours worked. This case is factually much closer to *Griffin and Brand* where a joint employer relationship was found to exist than to *Aimable*, viewing the circumstances of the whole activity rather than isolated or technical factors. *See Griffin and Brand*, 471 F.2d at 237 (citation omitted).

At oral argument, counsel for defendants stated that the farm's efforts to insure that the labor contractor complies with minimum wage and immigration requirements was a good faith effort to comply with applicable laws, and should not be viewed as indicia of control. Apparently, agricultural operations are subject to various regulatory provisions which do not define "employer" in the same manner. However, neither *Aimable* nor the other cases cited indicate that the farmer's subjective intent is relevant to the joint employer issue; it is the objective regulatory and non-regulatory factors which are determinative.

On balance, plaintiffs have shown that they are economically dependent upon defendants for their livelihood. Two of the non-regulatory factors favor plaintiffs. Two of the five regulatory factors support a finding that defendants were joint employers of the plaintiffs and the third—the power to hire, fire, or modify employment conditions—is a close call. Therefore, plaintiffs' motion for partial summary judgment is granted and defendant is subject to the AWPA and FLSA as an "employer".

## II

Plaintiffs seek damages from defendants for injuries incurred on April 3, 1990 while riding in a van operated by Carlos Perez. Plaintiffs' claim that defendants violated the transportation provisions of the AWPA by allowing Perez, an unauthorized driver without proper insurance on his vehicle, to transport the workers on the day of the accident. *See* 29 U.S.C. § 1841; 29 C.F.R. § 500.40. Plaintiffs claim that defendants violated 29 U.S.C. § 1841(b)(1) by "using, or causing to be used" Perez's van to drive the workers to defendants' fields. This requirement only applies to transportation of workers by employers or farm labor contractors.

When an employer specifically directs or requires a farm labor contractor to use a vehicle to transport workers or carry out a task, the employer is responsible for complying with the AWPA transportation provisions. *See generally Saintida v. Tyre*, 783 F.Supp. 1368 (S.D.Fla.1992) (defendants caused transportation of harvest workers by farm labor contractor because necessary and workers relied on transportation to job site). There is no evidence in the record that Bartolo or Perez are farm labor contractors. Further, there is no evidence that defendants directed or required Rodriguez, Sr. or another crew leader to use Perez's van to transport workers on the date of the accident.

The complaint alleges that Rodriguez, Jr. hired one "Bartolo", who then hired plaintiffs. Count I alleges that Bartolo "with

actual or apparent authority" of defendants used Perez to transport plaintiffs on April 3, 1990. (Dkt. 1, par. 23). Plaintiffs argue that Perez was an agent of Harloff Farms and Rodriguez, Sr. and Rodriguez, Jr. in transporting the workers to the fields.

Perez testified that he worked at the farm for one day and the next day Bartolo asked him (Perez) to transport plaintiffs to the work site as a favor to him. (Dkt. 28, p. 9–11). Perez agreed and while en route to the fields on April 3, 1990, he drove his van off the road and crashed.

Only the crew leaders properly licensed and authorized were allowed to bring the workers to the farm. (Dkt. 33, p. 26). Rodriguez Sr. owned the bus used to transport the workers to the fields and carried insurance on the bus. (Dkt. 35, p. 20). He employed his son to drive the bus. (Dkt. 35, p. 10). He also employed Gloria Silva to provide transportation to the workers residing in Clewiston. (Dkt. 35, pp. 29–30, 53). The farm labor contractor Rodriguez, Sr. did not use any other vehicles to transport the workers. (Dkt. 35, pp. 9, 30). However, Rodriguez, Jr. stated that if workers missed the bus they would sometimes find their own transportation to the farm but it was their responsibility. (Dkt. 35, pp. 9–10).

Plaintiffs have not established the existence of genuine issues of material fact as to whether defendants caused the plaintiffs to be transported on the day of the accident. It is undisputed that Perez, who was hired the day before the accident, owned and drove the van which crashed. Rodriguez Sr. and Jr. stated that they did not know either Bartolo or Perez at the time of the accident. (Dkt. 35, pp. 15, 27, 42). David Harloff, the farm manager, also stated at his deposition that he had no idea who Bartolo was. (Dkt. 33, pp. 30–31). Bartolo and Perez were fellow laborers. Bartolo had just started work at the farm the day before the crash as reflected in the payroll records. (Dkt. 32, p. 50).

 There is no evidence that Bartolo or Perez were acting upon the authority of the farm or the farm labor contractors. The farm labor contractor denied knowing Bartolo and Perez. Defendants cannot be held liable for action or events beyond their control. Further, car pooling arrangements made amongst the workers and not specifically directed or requested by the employer, crew leader or agent thereof preclude liability upon the employer. "The transportation safety provisions do not include certain car pooling arrangements." 29 C.F.R. § 500.70(c). *See also* 29 C.F.R. § 500.100(c); § 500.103(c); § 500.120. The evidence adduced to date establishes that defendants did not direct or request that Perez use his van to transport the workers but rather that he did so as a favor to an acquaintance, Bartolo. (Dkt. 28, pp. 10–11).

Plaintiffs have failed to meet their burden on the violation of the AWPA's transportation provisions claim regarding Perez in Count I thus, summary judgment in favor of defendants is appropriate.[4]

Upon consideration, it is ORDERED:

(1) that Defendants' Motion for Partial Summary Judgment (Dkt. 26) and Defendants' Supplemental Motion for Summary Judgment (Dkt. 44) are GRANTED in part and DENIED in part;

(2) that Plaintiffs' Motion for Partial Summary Judgment (Dkt. 29) is GRANTED in part and DENIED in part;

(3) that partial summary judgment is entered in favor of 1) plaintiffs on the issue of whether defendants are "joint employers" under the AWPA and FLSA and in favor of 2) defendants on the issue of whether defendants "caused" plaintiffs to be transported in the van which was involved in the April 3, 1990 accident;

(4) that Plaintiff's Motion for Leave to Substitute Expert Witness (Dkt. 60) is DENIED AS MOOT for the reasons stated at the hearing held on October 20, 1994.

**DONE** and **ORDERED.**

---

**4.** It is therefore unnecessary to address defendants' alternate contention that punitive damages are not recoverable.